# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| TEIMURAZ TSIREKIDZE, On behalf of Himself and All Others Similarly Situated, | |
| Plaintiff, | No. 2:07-cv-02204-FJM |
| vs. | (consolidated) |
| SYNTAX-BRILLIAN CORP.; MAN KIT (THOMAS) CHOW; JOHN S. HODGSON; JAMES CHING HUA LI; WAYNE A. PRATT; VINCENT F. SOLLITTO, JR.; BREAN MURRAY, CARRET & CO., LLC; CANACCORD ADAMS INC.; GROBSTEIN, HORWATH & COMPANY LLP; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; ROBERT W. BAIRD & CO. INCORPORATED; and UBS SECURITIES LLC | |
| Defendants. | |

## AFFIDAVIT OF VINITA M. JUNEJA, PH.D.

# CONTENTS

Contents ........................................................................................................................... i

List of Exhibits................................................................................................................ ii

I.       Introduction and Summary of Opinion ...........................................................1
         A.   Summary of Opinion.................................................................................2

II.      Qualifications ....................................................................................................3
         A.   Vinita M. Juneja, Ph.D..............................................................................3
         B.   Materials Considered ...............................................................................4
         C.   Remuneration ...........................................................................................4

III.     Case Background ..............................................................................................4
         A.   Key Plaintiff Allegations ..........................................................................4
         B.   Syntax's Secondary Public Offering.........................................................5
         C.   Share Lockup in Connection with the Secondary Public Offering.........6

IV.      Tracing Is a Necessary Element to a Section 11 Claim and, Except in Certain Limited
         Circumstances, It Is Impossible to Trace Open Market Purchases of Syntax's
         Common Shares to Shares Issued in the SPO.................................................7
         A.   How the Traceability Problem of Shares Arises.......................................7
         B.   Except in Certain Limited Circumstances, Aftermarket Purchasers of Syntax's Stock
              Would Find It Virtually Impossible to Trace Their Purchases to the SPO......................10

V.       A Proof of Claim Process Is the Most Accurate Way to Determine the Number of
         Valid Claims ....................................................................................................12

VI.      Conclusion ......................................................................................................13

VII.     Miscellaneous ................................................................................................14

## LIST OF EXHIBITS

Exhibit 1.   Curriculum Vitae ........................................................................................................4

Exhibit 2.   Materials Considered ................................................................................................4

# I.   INTRODUCTION AND SUMMARY OF OPINION

1.     Plaintiff Teimuraz Tsirekidze ("Plaintiff"), the City of St. Clair Shores Police & Fire Retirement System ("Lead Plaintiff"), and named plaintiff the City of New Haven Policemen and Fireman's Pension Fund ("Named Plaintiff"), have brought legal action against several defendants, among them former directors and officers of Syntax-Brillian Corporation ("Syntax Defendants") and the underwriters of the Secondary Public Offering[1] ("SPO") of Syntax-Brillian Corporation ("Syntax"), namely, Brean Murray, Carret & Co., LLC ("Brean"), Canaccord Adams Inc. ("Canaccord"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), Robert W. Baird & Co. Incorporated ("Baird"), and UBS Securities LLC ("UBS"), collectively the "Underwriter Defendants."

2.     The allegations in this matter are outlined in the Consolidated Class Action Complaint[2] ("Complaint").  The Complaint alleges that "improper accounting for revenues and 'tooling deposits' artificially inflated [Syntax's] revenues, profit margins, and earnings per share."[3]  Plaintiffs seek to certify a class ("Class") consisting of all purchasers of Syntax common stock during the period between February 9, 2007 and November 14, 2007 ("Alleged Class Period").  In addition, plaintiffs specifically allege a claim under Section 11 of the Securities Act of 1933 for those members of the Class who purchased Syntax common stock "pursuant and/or traceable to the SPO."[4]

3.     Counsel for the Underwriter Defendants has asked NERA Economic Consulting ("NERA") to review the Complaint and the facts of the SPO and opine on two questions.  The first question concerns whether it is possible for investors who purchased shares in the

---

[1]   Syntax conducted a Secondary Public Offering that priced on May 23, 2007.  The company sold 29.45 million common shares, including 3.84 million shares using an overallotment option, at an offering price of $5.75 per share.

[2]   Consolidated Class Action Complaint in the matter of Teimuraz Tsirekidze, On Behalf of Himself and All Others Similarly Situated, Plaintiff vs. Syntax-Brillian Corp.; Man Kit (Thomas) Chow; John S. Hodgson; James Ching Hua Li; Wayne A. Pratt; Vincent F. Sollitto, Jr.; Brean Murray, Carret & Co., LLC; Canaccord Adams Inc.; Grobstein, Horwath & Company LLP; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Robert W. Baird & Co. Incorporated; and UBS Securities LLC, Defendants, No. 2:07-cv-02204-FJM (consolidated).

[3]   *Ibid.* ¶2.

[4]   *Ibid.* ¶43.

1

aftermarket[5] of the SPO to trace these shares with certainty to shares issued in the SPO.  The second question concerns opining on the value of a court-sanctioned proof-of-claim process at this stage of the litigation as a way to answer the question of which shareholders will be able to provide a valid proof of claim based on their trading.

### A.  Summary of Opinion

4.      Syntax issued 29.45 million shares of common stock in its SPO (including 3.84 million shares to cover over-allotments).[6]  Prior to the SPO, there were over 62.78 million shares of Syntax common stock outstanding, of which at least 45 million were not owned by insiders or large beneficial owners.  After the SPO, the shares trading in the aftermarket could have been either those issued in the SPO or the 62.78 million pre-existing shares ("pre-SPO shares").  Potential class members who purchased Syntax common stock during the Alleged Class Period in the SPO aftermarket would have no *a priori* reason to be certain that the particular shares they purchased were issued in the SPO.  In fact, because the number of pre-SPO shares (62.78 million) was much larger than the 29.45 million shares issued in the SPO, more than two thirds of the pool of shares outstanding and potentially available to trade after the SPO were pre-SPO shares.

5.      Due to the specifics of the U.S. securities clearing process and due to corroborating Syntax-specific evidence of aftermarket sales of pre-SPO shares, we find that it is virtually impossible to determine which aftermarket purchases during the Alleged Class Period involve shares issued in the SPO.  To attempt to trace share purchases to shares issued in the SPO would be costly, time consuming, impractical, and in the vast majority of cases likely unsuccessful.  We know of no efficient method for making this determination given the existence of pre-SPO shares.  The determination cannot be made for most shares purchased in the SPO aftermarket and during the Alleged Class Period.

6.      Even assuming that liability were to be established and that there exist certain shares that can be traced to the SPO, a valid claim would depend on three factors: 1) the willingness of the purchaser to come forth and submit a claim; 2) the ability of the purchaser to

---

[5]    We use the term aftermarket here to include both shares purchased on days subsequent to the SPO, as well as shares purchased on the day of the SPO that were not directly purchased in the SPO from an underwriter.

[6]    Prospectus Supplement Filed Pursuant to Rule 424(b)(5).

trace these shares to the SPO; and 3) the timing of any such purchase and any subsequent sale in light of affirmative defenses of negative causation available to Syntax Defendants and the Underwriter Defendants.  Any attempt to use a claiming rate model to ascertain the number of claimants that will file a valid claim and a trading volume model to ascertain the exact price, amount, and timing of sales would be inferior to a court-sanctioned proof-of-claim process that allows investors with a claim to come forward.

## II.    QUALIFICATIONS

### A.  Vinita M. Juneja, Ph.D.

7.      I am a Senior Vice President and the Chair of the Global Securities and Finance Practice of NERA Economic Consulting.  NERA was established in 1961 and now employs approximately 600 people in over 20 offices worldwide.  The Global Securities and Finance Practice dates from the early 1970s and employs a research staff of over 150 professionals with economics, finance, accounting, and mathematics degrees.  The practice's clients include major securities exchanges, risk managers, principals requiring valuation services, and parties in litigation and arbitration.

8.      I have a B.A. in economics from the University of Western Ontario and an M.A. and a Ph.D. in economics from Harvard University.  I have taught courses in economics and business regulation, and currently serve as an arbitrator for the Financial Industry Regulatory Authority.  My publications include chapters in books on the topics of securities litigation and arbitration and event studies.  I have authored papers on the extent and nature of shareholder claims.  I have testified at trials and at depositions and have submitted affidavits as an expert in United States federal and state courts, in Canadian courts, and in arbitrations.  My testimony, affidavits, and depositions have covered numerous economic, financial, and statistical issues arising in many securities, finance, and valuation-related lawsuits, including many shareholder class actions and derivative actions.  Subjects covered in these testimonies, affidavits, and depositions have included analyses of causation, the materiality of news to investors, the impact of news on company share prices, the tracing of shares in connection with public offerings, the proper calculation of damages and other issues related to shareholder litigations.  I have spoken frequently on event studies, the calculation of damages in securities litigation

3

and other topics to audiences including risk managers, executives from publicly traded corporations, insurance industry participants, and lawyers.

9.      My curriculum vitae, which lists my publications from the past 10 years and testifying experience from the past four years, is attached as Exhibit 1.  In preparing this report, I have been assisted by others at NERA, who have worked under my supervision and review.

*Exhibit 1.        Curriculum Vitae*

## B.  Materials Considered

10.      In the course of performing my evaluation, I have reviewed the documents identified herein, pleadings, tabulations, lists, directories, and other published compilations generally used and relied upon by persons in my field of occupation.

11.      The materials considered in preparation of this report are listed in Exhibit 2.

*Exhibit 2.        Materials Considered*

## C.  Remuneration

12.      NERA is being compensated for its time and out-of-pocket expenses at standard billing rates.  My current hourly rate is $615.  The hourly billing rates charged for other NERA professionals who worked on this matter range from $195 to $635 per hour.

## III.   CASE BACKGROUND

### A.  Key Plaintiff Allegations

13.      Plaintiffs allege that during the Alleged Class Period defendants signed, certified, and filed false and misleading financial statements with the SEC that reflected various accounting manipulations.[7]  Furthermore, Plaintiffs allege that, in connection with its SPO, Syntax issued SEC filings, including a Registration Statement dated April 6, 2007, a Prospectus dated April 30, 2007, a Preliminary Prospectus Supplement dated May 14, 2007, and a Prospectus Supplement filed May 24, 2007, that served to materially inflate the price of

---

[7]    Complaint, ¶¶1-2.

4

Syntax's common shares.[8]  The alleged accounting manipulations include recording revenue in violation of GAAP on television consignment sales to Syntax's largest Asian distributor, South China House of Technology ("SCHOT"), and artificially inflated profit margins and net income through the use of "tooling deposits."[9]

14.     On pages 60-66 of the Complaint,[10] Plaintiffs outline the following dates on which they allege that information allegedly not disclosed in a timely fashion first became known:

> a.  On September 12, 2007, in addition to announcing its results for the year end and fiscal 4Q07, Syntax announced the departure of its Chief Financial Officer and projected revenue of $170 million to $180 million for fiscal 1Q08, below the company's prior revenue projection of $254 million.
>
> b.  On November 8, 2007, Syntax announced fiscal 1Q08 results with revenues below those that had been projected on September 12, 2007.  The company also announced that it had ended its primary distributor agreement with SCHOT, and that it would henceforth license the Olevia brand in Asia to Olevia Far East and receive a fee for each television sold, a consignment sale business model.
>
> c.  On November 15, 2007, before the market opened, Syntax filed its Form 10-Q for 1Q08, revealing that, of the $123.2 million owed to the company by SCHOT, $98 million was more than 120 days past due as of November 8, 2007.

## B.  Syntax's Secondary Public Offering

15.     On May 23, 2007, Syntax announced the pricing for the public offering of 25.61 million shares of its common stock at a public offering price of $5.75 per share.  On May 30, 2007, the company announced the closing of the 29.45 million share public offering which included 3.84 million shares sold pursuant to the underwriters' overallotment option.  The SPO also included a 90-day lock-up provision which applied to certain shareholders that held shares prior to the SPO.  The lock-up provision is discussed in more detail below.

---

[8]   *Ibid.* ¶2, note 1.

[9]   *Ibid.* ¶2, note 2.

## C.  Share Lockup in Connection with the Secondary Public Offering

16.     In Form 424B5 (Prospectus Supplement) filed May 24, 2005, Syntax outlines the 90-day lock-up provision applied to the company's common stock and any other securities or derivatives referring to or convertible into common stock.  Specifically, the company stated as follows:

> We and the selling stockholders and our executive officers, directors, and certain of our significant stockholders have agreed, with exceptions, not to sell or transfer any common stock for 90 days after the date of this prospectus supplement without first obtaining the written consent of Merrill Lynch….  This lock-up provision applies to common stock and to securities convertible into or exchangeable or exercisable for or repayable with common stock.  It also applies to common stock owned now or acquired later by the person executing the agreement or for which the person executing the agreement later acquires the power of disposition.[11]

17.     Our understanding is that the lock-up agreement applied only to Syntax, the selling stockholders (Taiwan Kolin Co. Ltd., Great Step Company Ltd., and the 1999 Chow Family Trust), executive officers, directors, and certain other significant stockholders;[12] it did not apply to stockholders not classified as "significant."  Furthermore, it is our understanding that the phrase, "our significant stockholders have agreed, with exceptions" suggests that some parties did not agree to the lock-up.  Thus, there were most likely significant stockholders that had pre-SPO shares that were not locked up after the SPO and were able to be traded in the SPO aftermarket.  At most, the shares held by directors, executive officers, and large beneficial owners equaled approximately 17 million[13] out of the 62.78 million shares outstanding prior to the SPO.  Therefore, we know there were at least 45 million pre-SPO shares owned by others.  These shares were the float, i.e., shares that were available to trade. They had the potential to trade publicly and would have traded publicly prior to the SPO and it is extremely likely that many of them continued to trade after the SPO.

---

[10]   The relevant passages of the Complaint are ¶¶166-171, ¶¶181-182, and ¶187.

[11]   See Syntax-Brillian SEC Form 424B5 filed May 24, 2007, p. S-58.

[12]   The lock-up signatories are listed in Schedule G attached to the Purchase Agreement attached as Exhibit 1.1 to the company's SEC Form 8-K filed on May 24, 2007.

[13]   According to Syntax's SEC filings on Form DEF-14A filed October 25, 2006, directors, executive officers, and persons that beneficially owned more than 5% of Syntax's common stock together held an aggregate of 17,097,776 shares, excluding options and warrants.  This figure includes all the lock-up signatories.

**IV.    TRACING IS A NECESSARY ELEMENT TO A SECTION 11 CLAIM AND, EXCEPT IN CERTAIN LIMITED CIRCUMSTANCES, IT IS IMPOSSIBLE TO TRACE OPEN MARKET PURCHASES OF SYNTAX'S COMMON SHARES TO SHARES ISSUED IN THE SPO**

### A. How the Traceability Problem of Shares Arises

18.     In general, individual shares cannot be traced because shares do not have unique identifiers.  Tracing shares of stock is not, for example, like tracing dollar bills.  If individual A sold a dollar bill with serial number 123 and individual B is holding a dollar bill with that same serial number, then we could conclude that that bill directly, or indirectly, came from A.  In general, no such identifier exists for shares of stock, making a similar tracking exercise impossible.

19.     The shares that an investor purchases can be held in one of two ways.  First, the investor can obtain a certificate representing those shares, registering the shares under his name with the company's transfer agent.  Far more commonly though, shares are held in "street name."  In that case, the depository or other intermediary is the *nominee* holder of the shares. That is, while these shares are registered under the name of the depository or other intermediary, the investor is still the *beneficial* owner of the shares in that he claims all of the rights and privileges associated with ownership.[14]  The depository holds a *fungible mass* of shares of each security; in other words, the shares of individual investors are indistinguishable within the larger pool of shares registered with that depository.

20.     The vast majority of publicly traded shares are held in street name.  For example, in 1999, the Depository Trust Company ("DTC"), the single largest nominee holder of shares, reported that it held in custody and serviced $23 trillion in securities.  These securities represented 83% of all NYSE shares, 72% of all Nasdaq Market shares, 91% of the principal outstanding corporate debt listed on the NYSE, and similar high percentages of most issues listed on the Amex and on regional exchanges.[15]  By year-end 2007, the value of the

---

[14]    See, for example, David M Weiss, "Transfers," Chapter 7, Section B in *After the Trade is Made: Processing Securities Transactions*, (New York: Penguin Group USA, 2006, 2nd ed.), p. 375 or Marcia Stigum, "Clearing Trades in Physical Securities" Chapter 11 in *After the Trade: Dealer and Clearing Bank Operations in Money Market and Government Securities* (Homewood, IL: Dow Jones-Irwin, 1988).

[15]    DTC Annual Report, 1999, p. 17.

securities held by the DTC had grown to $40 trillion (the DTC no longer tracks the percentages of total market shares held).[16]

21.     The current system of share ownership originated in the early 1970s.  Before that time, security certificates were generally transferred physically between brokerages.  By the late 1960s, however, a "paper crunch" arose because of the logistical difficulties associated with the transfer of millions of certificates between brokerages.  Beginning in the early 1970s, brokers and other institutions that traded securities began to hold their shares through depositories.[17]  DTC arose as a central location for the "immobilization" of stock certificates. DTC is responsible for physical custody of the certificates, as well as the processing of transactions for these stocks.  Over the past 30 years, the practice of holding securities at a central location has become widespread.  DTC has emerged as the largest depository of shares and is involved in 90% of the transactions in immobilized securities.[18]

22.     DTC records the shares held by each participating firm on its books, and, in turn, each participating firm is responsible for keeping track of the shares owned by each of its customers.  The shares are registered at DTC through its nominee, Cede & Company ("Cede").[19]

23.     Even after they are traded, many shares held at DTC do not actually leave the participant firm's books at DTC.  For example, assume that in a single day customer A, a Goldman Sachs brokerage customer purchases 100 shares of Syntax common stock, customer B, another Goldman Sachs customer sells 200 shares, while a third Goldman Sachs customer, customer C, purchases 100 shares.  In this case, DTC would record no net change in Goldman Sachs's position.  Of the 200 shares sold, it is generally impossible to determine which shares went to customer A and which to customer C or even if customer B was the source of *any* of their shares.  Instead, the counterparties to customers A and C may have been non-Goldman Sachs entities.

---

[16]   DTC Annual Report, 2007, p. 24.

[17]   For more information on the differences between the old and new systems of securities ownership, see Ralph C. Ferrara and Konrad S. Alt, "Immobilization of the Security Certificate: The U.S. Experience," 15(3) *Securities Regulation Law Journal*  (1987), pp. 228-52.

[18]   Marcia Stigum (1988), *After the Trade: Dealer and Clearing Bank Operations in Money Market and Government Securities,* p. 257.

24.     Exchange rules allow and often encourage the aggregation of trades under various circumstances[20] that make it impossible to identify a single selling counterparty for a given purchase.  Even if a customer who purchased a share in the aftermarket can identify the counterparty to his or her trade, aggregation at the counterparty level would obscure the origin of the purchased share.  For example, investment managers frequently effect a trade and then use an allocation formula to allocate the shares to specific customer accounts.  In such a situation, for a share purchased from such an investment manager as a counterparty, one would not be able to know from which of the investment manager's clients a purchased share came.  Note that similarly, an investment manager that purchases shares in the aftermarket would use a formula to allocate the shares to its customers and in the process SPO shares could be intermixed with the pre-SPO shares.  Once that pool of intermixed shares is broken up, e.g., by selling only some of the intermixed shares, this would be sufficient to make all SPO shares part of that pool untraceable by any further purchaser.

25.     DTC also nets trades across brokers.  This netting occurs through the National Securities Clearing Corporation ("NSCC"), a sister organization of DTC.  Through this system, NSCC and DTC are able to drastically lower the number of transactions that require a change in the number of securities held by each firm on the books of DTC.  For example, assume that Bank of America buys 1,000 shares of a security from Goldman Sachs, and, on the same day, Goldman Sachs buys 2,000 shares from Bank of America.  Instead of recording two separate transactions, the NSCC will net the transactions and reduce the number of Bank of America owned shares on the books at DTC by 1,000, and increase Goldman Sachs's holdings by the same amount.  Thus, transactions between brokers commonly do not result in the physical transfer of shares from one broker to another.

26.     Certificate holders (investors holding shares registered in their own name) do not receive a certificate for each share.  Rather, they receive a single certificate for each purchase and the remaining unsold portion of a particular security.  For example, if an investor holds a certificate for 300 shares and decides to sell 100 shares, he or she turns in the certificate for 300 shares and obtains a new certificate for 200 shares.  As such, there is no way of

---

[19]   David M Weiss (2006), *After the Trade is Made: Processing Securities Transactions*, p. 376.

[20]   For example, in the opening trade on an exchange many orders are lumped together and executed as a block, e.g., trades executed in the Nasdaq opening cross.

determining which 100 of the original 300 shares were sold unless at the time of the transaction the investor has specifically designated which shares were sold for tax purposes (even then the designation can be just an accounting designation rather than an identification of shares actually bought in the SPO) or is holding different stock certificates at different brokerage firms for shares bought in the SPO and for other shares.

27.     Given the current system for share ownership, described above, in most instances one cannot physically trace shares.  Furthermore, there is no established and reliable method through which one could even typically *deduce* that the ultimate source for a given share was the SPO.  As a first step, each aftermarket purchaser of Syntax's stock would need to identify the seller from whom they purchased and show that the seller either received an SPO share in the allocation process or can prove that he sold a share traceable to the SPO.  This type of showing would be possible only under highly unusual circumstances.  For example, if an aftermarket purchaser can identify that he purchased from an investor who held no shares prior to the SPO, received an allocation of Syntax shares in the SPO, and subsequently sold those shares to him, the aftermarket purchaser could theoretically deduce that his shares came from the SPO.  The aftermarket purchaser, in order to identify who sold the shares to him, would need access to non-public information.[21]  Even if all the conditions necessary to identify the seller of a given purchase were met for an isolated trade, or if someone could trace their Syntax shares to shares issued in the SPO because they were purchased in a private transaction from a party with an SPO allocation, finding which trades met these conditions would be prohibitively costly and time consuming.

## B.  Except in Certain Limited Circumstances, Aftermarket Purchasers of Syntax's Stock Would Find It Virtually Impossible to Trace Their Purchases to the SPO

28.     Using information publicly available, we are able to document that the traceability problems outlined above actually exist in Syntax's case.  Below we point to evidence specific to Syntax that indicates that shares not issued in the SPO were traded in the

---

[21]   Although it may be possible for the purchaser to find out the identity of the contra broker in the transaction (the selling broker), without access to non-public information, the purchaser would not know the selling broker's customer (the ultimate seller).

aftermarket.  Distinguishing those shares from the shares issued in the SPO would, in the vast majority of cases be virtually impossible.

29.     In addition to the 29.45 shares issued in the SPO, there were more than 62.78 million pre-existing shares outstanding prior to the SPO, of which at least 45 million shares were freely tradable and indistinguishable from the SPO shares.  Publicly available data on institutional holdings offers evidence that pre-SPO shares were sold after the SPO, in the aftermarket period.

30.     Through consulting select SEC Form 13-F filings and aggregate 13-F filings data compiled by *Thomson Financial,* we are able to obtain a snapshot of institutional holdings at the end of each quarter.  We examined the quarterly holdings by institution at the end of the quarters prior to and after the SPO took place.

31.     Consider the example of Noesis Capital Management Corp. ("Noesis") which held 5,574,747 shares of Syntax common stock as of March 31, 2007, the most recent quarter-end prior to the SPO.[22]  As of June 30, 2007, the first quarter end after the pricing of the SPO, Noesis held only 1,231,771 shares of Syntax common stock.[23]  It is extremely likely that at least some portion of the 4,342,976 net shares sold by Noesis were pre-SPO shares that were sold on the day of or following the SPO and within the remainder of the quarter ending June 30, 2007.

32.     In addition, consider American Century Investment Management ("American Century") which held 1,493,076 shares of Syntax common stock as of March 31, 2007, the most recent quarter-end prior to the SPO.[24]  As of June 30, 2007, the first quarter-end after the pricing of the SPO, American Century held no shares of Syntax common stock.[25]  It is very likely that American Century sold at least some portion of its 1,493,076 pre-SPO shares on the day of or following the SPO and within the remainder of the quarter ending June 30, 2007.  The

---

[22]   See SEC Form 13F for Noesis Capital Management Corp. for the quarter ended March 31, 2007, filed May 2, 2007.

[23]   See SEC Form 13F for Noesis Capital Management Corp. for the quarter ended June 30, 2007, filed July 27, 2007.

[24]   See SEC Form 13F for American Century Companies, Inc. for the quarter ended March 31, 2007, filed May 14, 2007.

[25]   See SEC Form 13F for American Century Companies, Inc. for the quarter ended June 30, 2007, filed August 9, 2007.

above examples illustrate that many pre-SPO shares were sold after the SPO, making it in most instances impossible to affirmatively link aftermarket purchases to shares issued in the SPO.

33.     There are many more similar examples of institutions that sold pre-SPO shares on the day of or following the SPO and within the remainder of the quarter ending June 30, 2007.  Using the data on institutional holdings provided by *Thomson Financial*, we find that institutions that held pre-SPO shares as of March 31, 2007 and were net sellers of Syntax common shares during the quarter ended June 30, 2007 sold an aggregate of 20,587,823 shares during the quarter containing the SPO.  It is extremely likely that at least some portion of these shares were pre-SPO shares sold following the SPO.  Thus, anyone purchasing a Syntax share in the SPO aftermarket would find it nearly always impossible to assess with certainty whether the purchased share was issued in the SPO.

## V.     A PROOF OF CLAIM PROCESS IS THE MOST ACCURATE WAY TO DETERMINE THE NUMBER OF VALID CLAIMS

34.     Given the general impossibility of tracing aftermarket purchases to shares issued in the SPO, a proof-of-claim process at this stage of the litigation would allow the court to determine the validity of any individual claim, assuming that plaintiffs eventually prevail on liability.

35.     In addition, to establish the validity of a claim, plaintiffs must show they bought during the Alleged Class Period and that they suffered a loss resulting from the wrongful actions of the defendants.  Affirmative defenses of negative causation available to Syntax Defendants and the Underwriter Defendants make establishing the timing of sales essential to assessing the validity of any damage claim.

36.     Actual claims will eventually become known based on the submissions made in the claims process; the question is whether some other figure, based on a claming rate model, a trading volume model or otherwise, which will necessarily be less precise, will exist for a prior time only to be supplanted with the correct figure.

37.     In light of the availability of an efficient court-sanctioned proof-of-claims process, the use of any trading volume model would introduce a degree of inherent uncertainty about the price, amount, and timing of plaintiffs' sales.  Moreover, if liability were to be found

in this matter, a proof-of-claim process would ultimately be necessary to identify which individual investors have claims and in what amount.  Thus, any estimate from a trading volume model would ultimately be replaced by actual data, meaning that there would be no benefit to the class members from developing the trading volume model and using it through the litigation.

38.     Furthermore, the number of claimants will not be known with certainty until a proof-of-claims process has been conducted.  Attempts to use a claiming rate model to ascertain the number of claimants that will file a valid claim would be inferior to a court-sanctioned proof-of-claim process that allows investors with a claim to come forward at this stage of the litigation.  The composition of the class could be determined through such a process and this can also be used to ultimately establish the exact amount of damages, if any, to class members, if liability were to be established.

## VI.   CONCLUSION

39.     In the vast majority of cases it is virtually impossible to determine which aftermarket purchases involve shares issued in the SPO.  To attempt to trace share purchases to shares issued in the SPO would be costly, time consuming, impractical, and usually unsuccessful.  We know of no efficient method for making this determination given the pre-existing shares of Syntax common stock.  Indeed, for most shares, the question is simply unanswerable.

40.     In addition, assuming liability is established, the exact claimants who will be able and willing to come forward and properly establish a valid claim for any eligible purchases of SPO shares is uncertain, and attempts to ascertain it using a trading model or a model of claiming rates will be inferior to a court-sanctioned proof-of-claim process that allows investors with a claim to come forward at this stage of the litigation.

## VII.   MISCELLANEOUS

41.    My work is ongoing and my opinions are subject to revision based on new information that subsequently may be provided to, or obtained by me.

Respectfully submitted,

Vinita M. Juneja, Ph.D.

Subscribed and sworn to before me

this   27th   day of March, 2009

Notary Public

EDWARD M. WALTERS
Notary Public, State of New York
No. 01WA6132942
Qualified in New York County
Commission Expires August 29, 2009

14

**NERA**
Economic Consulting

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 3148
vinita.juneja@nera.com
www.nera.com

# Vinita M. Juneja
## Senior Vice President
## Chair of Global Securities and Finance Practice

## Education

**Harvard University**
Ph.D., Economics, 1988
Social Sciences and Humanities Research Council of Canada
Doctoral Fellow, 1982-1985
A.M., Economics, 1983

**University of Western Ontario**
B.A., Honors, Economics, 1980
U.W.O. Continuing Scholar, 1976-1980
Dean's Honors List, 1976-1979

## Professional Experience

**NERA Economic Consulting**

| | |
|---|---|
| 2006 - | Chair, Global Securities & Finance Practice |
| 2006 - | Board of Directors |
| 2000- | Senior Vice President |
| | Directs projects in the areas of securities economics, finance, and valuation. |
| 1995-2000 | Vice President |
| 1988-1995 | Senior Consultant |
| 1988 | Senior Economic Analyst |
| 1985-1987 | Economic Analyst |

**Harvard University**

| | |
|---|---|
| 1983-1985 | Assistant Head Tutor, Department of Economics |
| | Helped to coordinate and administer the undergraduate program in economics at Harvard College; advised undergraduates on their course of study. |

1982-1985     Teaching Fellow, Department of Economics
                      Taught microeconomics, economics of business regulation, and economics
                      of bureaucracy.

1982-1985     Resident Tutor, Cabot House, Harvard College
                      Served as economics tutor and academic advisor.

**Shell Canada**

1981-1982     Economic Consultant, Strategic Planning Department
                      Responsible for a study of multinationals and foreign investment with focus
                      on the oil and natural gas sectors.

Summer 1981 Junior Economist, Strategic Planning Department
                      Responsible for economic forecasting of the world oil market, policy
                      analysis, and macroeconomic research.

**University of Western Ontario**

1979-1980     Teaching Assistant, Department of Economics
                      Taught microeconomics and labor economics.

**Toronto Investment Management**

Summer 1979 Economic Consultant
                      Conducted research for various projects, including reports on forecasting and
                      the size of the market sector in Canada.

**University of Toronto**

Summer 1979 Teaching Assistant, Department of Economics
                      Taught introductory economics.

## Honors and Professional Activities

Member, FINRA Board of Arbitrators, 2007 - Present

Member, NASD Board of Arbitrators, 1990 - 2007

Member, American Economic Association

Member, American Finance Association

American Bar Association, Industrial Organization Economist Associate; member
        of Business Law and Litigation Sections

Exhibit 1
Page 3 of 4

## Testimony (Last Four Years)

Deposition before the United States District Court Southern District of New York in the matter of: *Kingsway Financial Services, Inc., et al. v. PricewaterhouseCoopers, LLP., John A. Dore, et al.*, 2009.

Cross examination before the Court of Queen's Bench of Alberta, in the matter between *William B. Wheeler v. 1000128 Alberta LTD., CNPC International (Canada) Ltd., China National Oil & Gas Exploration & Development Corp., CNPC International Ltd. and China National Petroleum Corporation*, 2009.

Cross examination before the Superior Court of Ontario, in the matter between *Paul Lawrence et al. and Atlas Cold Storage Holdings Inc. et al.*, 2007.

Deposition before the United States District Court Southern District of New York, in the matter of: *In Re Veeco Instruments Inc., et al. Securities Litigation*, 2007.

Deposition before the United States District Court for the Eastern District of Texas, Texarkana Division, in the matter of: *In Re Fleming Companies Securities Litigation*, 2007.

Testimony in an arbitration on expected future D&O liability claims against a pharmaceutical company and on costs of product recall, 2006.

Deposition before the United States District Court for the District of Minnesota in the matters of: *In re GenesisIntermedia, Inc. Securities Litigation; James P. Stephenson, as Trustee for the estate of MJK Clearing, Inc. v. Deutsche Bank AG, et al.; Ferris, Baker Watts, Inc. v. Deutsche Bank Securities Limited, et al.; E\*Trade Securities LLC v. Deutsche Bank AG, et al.; Wedbush Morgan Securities, Inc. v. Deutsche Bank AG, et al.; E\*Trade Securities, LLC, as assignee of Fiserv Securities, Inc. v. Nomura Canada, Inc., et al.; CIBC World Markets, Inc. v. Deutsche Bank AG, et al.; and Stockwalk Group, Inc. v. Deutsche Bank AG, et al.*, 2005.

Trial testimony before the Ontario Court (Provincial Division) in the matter of *Regina v. John Bernard Felderhof*, 2005.

Testimony in an arbitration proceeding before the New York Stock Exchange, Inc. in the matter of *Emlen Investments, Inc. et al. v. Merrill Lynch Investment Managers, L.P. (f/k/a Merrill Lynch Asset Management, L.P.) et al.*, 2005.

## Publications (Last Ten Years)

with John H. Johnson, "The Use of Event Studies in Intellectual Property Litigation," in *Economic Approaches to Intellectual Property Policy, Litigation, and Management*, ed. Gregory K. Leonard and Lauren J. Stiroh (New York: National Economic Research Associates, 2005).

with David Tabak and Denise Martin, "Are Investors Signaling You About Your Y2K Risk?" *Y2K Marketwatch*, December 1999.

with Todd S. Foster, Denise N. Martin, Frederick C. Dunbar, and Lucy P. Allen, "Securities Litigation Reform: Problems and Progress," *Viewpoint,* Issue No. 2, November 1999.

with Denise Martin and David Tabak, "What Does the Market Think About Your Y2K Exposure?" *Viewpoint*, Issue No. 2, November 1999.

with Todd S. Foster, Denise N. Martin, Frederick C. Dunbar, and Lucy P. Allen, "Trends in Securities Litigation and the Impact of the PSLRA," *Class Actions & Derivative Suits*, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999.

with Denise N. Martin, Todd S. Foster, and Frederick C. Dunbar, "Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions, "*Stanford Journal of Law, Business & Finance,* Spring 1999.

with Todd S. Foster, Denise N. Martin, and Frederick C. Dunbar, "Securities Litigation Trends," *Management Liability Review,* 1999.

3/27/09

**Exhibit 2**
**Syntax-Brillian Corporation**
**Materials Considered**

| Number | Document |
|:---:|:---:|
| (1) | (2) |

**Legal Documents**

1  Consolidated Class Action Complaint, United States District Court, District of Arizona, Case No. 2:07-cv-02204-FJM, dated August 25, 2008.

**SEC Filings for Syntax-Brillian Corporation**

2  Forms 10-K for 2006 and 2007.
3  Forms 10-Q for 2006 - 2008.
4  Forms DEF 14A, Proxy Statements, for 2006 and 2007.
5  Form S-3, Registration Statement, filed April 6, 2007.
6  Form 424B4, Prospectus, filed April 30, 2007.
7  Form 424B5, Preliminary Prospectus Supplement, filed May 14, 2007.
8  Form 424B5, Prospectus Supplement, filed May 24, 2007.
9  Form 8-K, filed May 24, 2007.

**SEC Filings for Noesis Capital Management Corporation and American Century Companies, Inc.**

10  Forms 13-F for the quarters ended March 31, 2007 and June 30, 2007.

**News, Financial Data, and Miscellaneous**

11  Daily Stock Price and Trading Volume Data for Syntax-Brillian Corporation from FactSet Research Systems, Inc.
12  News Stories for Syntax-Brillian Corporation from Factiva.
13  Detail on Syntax-Brillian Corporation's SPO from Bloomberg, L.P.
14  Quarterly institutional holdings data for Syntax-Brillian Corporation from Thomson ONE Banker.
15  1999 DTC Annual Report.
16  2007 DTC Annual Report.
17  News Stories and descriptive information regarding Nasdaq's Opening and Closing Crosses from Factiva and from the Nasdaq website.

**Published Literature**

18  Darrell Duffie, Nicolae Garleanu, and Lasse Heje Pedersen, "Securities Lending, Shorting, and Pricing," *Journal of Financial Economics* 66(2002), pp. 307-339.
19  Ralph C. Ferrara and Konrad S. Alt, "Immobilization of the Security Certificate: The U.S. Experience," 15(3) *Securities Regulation Law Journal* (1987), pp. 228-252.
20  Robert C. Apfel et. al, "Short Sales, Damages and Class Certification in 10B-5 Actions," NBER Working Paper (2001), Working Paper 8618.
21  Marcia Stigum, *After the Trade: Dealer and Clearing Bank Operations in Money Market and Government Securities*, (Homewood, IL: Dow Jones-Irwin, 1988).
22  David M. Weiss, *After the Trade is Made: Processing Securities Transactions*, (New York: Penguin Group USA, 2006, 2nd ed.).