Joel P. Hoxie (#005448)
Patricia Lee Refo (#017032)
Joseph G. Adams (#018210)
SNELL & WILMER LLP
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202
Telephone: (602) 382-6000
Facsimile: (602) 382-6070
E-mail: jadams@swlaw.com

Daniel P. Lefler (admitted *pro hac vice*)
Craig I. Varnen (admitted *pro hac vice*)
Shaunt T. Arevian (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 277-1010
Facsimile: (310) 203-7199
E-mail: dlefler@irell.com

Attorneys for Defendants
Vincent F. Sollitto, Jr., and Wayne Pratt

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Teimuraz Tsirekidze, On Behalf of Himself and All Others Similarly Situated,<br><br>                Plaintiff,<br><br>v.<br><br>Syntax-Brillian Corp.; Man Kit (Thomas) Chow; John S. Hodgson; James Ching Hua Li; Vincent F. Sollitto, Jr.; Wayne Pratt; Brean Murray, Carret & Co., LLC; Canaccord Adams Inc.; Grobstein, Horwarth & Company LLP; Merrill Lynch, Pierce, Fenner & Smith Inc.; Robert W. Baird & Co. Inc.; and UBS Securities LLC,<br><br>                Defendants.<br><br>And All Consolidated Cases. | No. CV-07-2204-PHX-FJM (Lead) (Consolidated)<br><br>**DEFENDANTS SOLLITTO AND PRATT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

## TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................................................. 1

II. FACTUAL SUMMARY ........................................................................................ 2

    A. Syntax's Business ........................................................................................ 2

    B. Exponentially Increasing Demand Drives Syntax's Efforts To Secure Sufficient Financing ...................................................................... 3

    C. Demand For Syntax's Products Remains Strong, But A Credit Crisis In Asia Cripples The Company's Ability To Meet Demand ........................................................................................................ 4

    D. Plaintiffs' Theory Of Loss ........................................................................... 5

III. ARGUMENT ......................................................................................................... 7

    A. The Alleged Misrepresentations In Syntax's Offering Documents Did Not Cause Plaintiffs' Loss ................................................ 8

        1. Loss Causation Cannot Exist For Stock Losses Resulting From Disclosures Which Do Not "Correct" The Alleged Misrepresentations ....................................................... 9

        2. The Undisputed Facts Demonstrate That Both Of The Supposedly "Corrective" Disclosures Were Unrelated To Plaintiffs' Theory of Wrongdoing ............................................ 11

            a. Syntax's September 12, 2007 Disclosures Were Unrelated To The Alleged Misrepresentations In The Offering Documents ........................................................ 11

            b. Syntax's November 14, 2007 Disclosure Was Unrelated To The Alleged Misrepresentations In The Offering Documents ........................................................ 14

    B. Sollitto And Pratt Are Also Entitled To Summary Judgment On Plaintiffs' Control Person Claim ............................................................. 14

IV. CONCLUSION ................................................................................................... 15

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Catogas v. Cyberonics,*
    292 Fed. App'x. 311 (5th Cir. 2008).................................................................9

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986).........................................................................................7

*Dura Pharmaceuticals, Inc. v. Broudo,*
    544 U.S. 336 (2005).........................................................................................8

*Hernandez v. Spacelabs Medical, Inc.,*
    343 F.3d 1107 (9th Cir. 2003)..........................................................................7

*In re Buca Inc. Sec. Litig.,*
    2006 WL 3030886 (D. Minn. Oct. 16, 2006) ...............................................12

*In re Daou Systems, Inc. Sec. Litig.,*
    411 F.3d 100 (9th Cir. 2005).......................................................................8, 9

*In re Downey Sec. Litig.,*
    2009 WL 736802 (C.D. Cal. March 18, 2009) ............................................13

*In re Omnicom Group, Inc. Sec. Litig.,*
    541 F. Supp. 2d 546 (S.D.N.Y. 2008).....................................................12, 14

*In re Shoretel Sec. Litig.,*
    2009 WL 248326 (N.D. Cal. Feb. 2, 2009) ................................ 8, 10, 11, 14

*In re VeriSign, Inc., Deriv. Litig.,*
    531 F. Supp. 2d 1173 (N.D. Cal. 2007).....................................................12, 14

*In re Williams Sec. Litig.,*
    558 F.3d 1130 (10th Cir. 2009)........................................................................9

*In re WorldCom, Inc. Sec. Litig.,*
    2005 WL 375314 (S.D.N.Y. February 17, 2005) .........................................8

*Lentell v. Merrill Lynch & Co.,*
    396 F.3d 161 (2d Cir. 2005).............................................................................9

*Lory v. Ryan,*
    2008 WL 4630306 (D. Ariz. Oct. 17, 2008)................................................13

*McKowan Lowe & Co. v. Jasmine, Ltd.,*
    231 Fed. App'x. 216 (3d Cir. 2007).................................................................9

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
    540 F.3d 1049 (9th Cir. 2008)................................................................ passim

*Nelson v. Pima Community College,*
    83 F.3d 1075 (9th Cir. 1996).............................................................................7

| | Page(s) |
|---|---|

*Paracor Finance, Inc. v. General Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ................................................................................ 15

**Statutes**

15 U.S.C. § 77k(e)(3) ................................................................................................ 8

15 U.S.C. § 77l(b) .................................................................................................... 8

**Rules**

Fed. R. Civ. P. 56 .............................................................................................. 7, 15

## I. INTRODUCTION

At the pleading stage, this Court dismissed without leave to amend the fraud claims alleged against Vincent Sollitto and Wayne Pratt, two former executives of Syntax-Brillian Corporation ("Syntax" or the "Company"), neither of whom ever sold a share of Syntax stock. As a result of the Court's decision, the only claims remaining against these two individuals are non-fraud claims under the Securities Act of 1933 that are based on alleged disclosure errors in connection with the Company's public offering of securities in May 2007 – six months prior to the end of the class period. Sollitto and Pratt now move for summary judgment of the Securities Act claims because the undisputed facts refute any showing of "loss causation." Loss causation requires proof that investors losses were actually caused by revelation of the alleged May 2007 disclosure errors, not by disclosures of other facts or by general economic conditions. Here, the undisputed facts show that the price declines that plaintiffs claim as damages did not result from disclosure of the alleged May 2007 errors.

As the Court is aware, Syntax was a manufacturer of high definition televisions under the Olevia brand name. Plaintiffs' liability theory for the Securities Act claims is that the offering documents the Company issued in connection with a May 2007 public stock offering (1) misrepresented the strength of demand in China for Olevia televisions and (2) concealed this supposed weakness through allegedly improper accounting (a) for "tooling deposits" with its primary supplier, Kolin, and (b) for revenues for sales to one of its distributors, SCHOT. Plaintiffs' damages theory is that they suffered harm based on declines in the price of Syntax common stock on September 12, 2007 and November 14, 2007. Sollitto and Pratt are entitled to summary judgment because the record makes clear that neither of these price declines resulted from disclosures correcting the claimed errors in the May offering.

To the contrary, far from disclosing weakening demand in China, the Company's September 12 disclosures reiterated that "[d]emand for Olevia in China is extremely high" and that Syntax was "modeling to grow at just under 100%" in China over the next quarter.

There was no disclosure of weakening demand (nor, was demand weakening). Additionally, the September 12 disclosures made no mention of any accounting issues relating to Syntax's tooling deposits with Kolin or its sales to SCHOT, thus the September 12 price decline did not result from any disclosure of the claimed accounting errors. Similarly, the November 14 disclosure did not report weakening in Chinese demand, nor did it disclose new facts about the supposed accounting issues relating to Kolin and SCHOT. Thus, the September 12 and November 14, 2007 stock price declines were not caused by disclosure of the alleged May 2007 errors upon which plaintiffs' liability theory is based. This lack of any causal connection between the purported misrepresentations and the claimed losses compels summary judgment.

## II.   FACTUAL SUMMARY[1]

### A.   Syntax's Business

Founded in the merger of Syntax Groups Corporation and Brillian Corporation in late 2005, Syntax grew to become a leading designer, developer, and distributor of high-definition televisions under the Olevia brand name. (Cmplt. ¶ 54; Doc. 133 (Defendants' Joint Request for Judicial Notice, granted by the Court on January 30, 2009 (doc. 198 at 3-5), Ex. A at 1.) In order to compete with its better capitalized competitors, Syntax employed what it termed a "virtual manufacturing model." Under this business model, the Company sourced to Asian suppliers and manufacturers the tasks of purchasing components (e.g., flat screen panels, printed circuit boards, etc.) and assembling the Company's televisions. (*Id.* at 5.) Thus, Syntax avoided paying cash upfront for its orders and was only obligated to pay after delivery of the assembled televisions. (*Id.* at 5-7.) In effect, this "virtual manufacturing model" permitted Syntax to use its suppliers' working capital. It also, however, entailed risk to the Company in the event its suppliers' working capital was constrained.

---

[1] This Section is intended to provide a sufficient factual context for the arguments presented below. Not all of the facts discussed herein are necessary to the Motion. The particular undisputed facts upon which this Motion is based are identified herein as "UF" and set forth in Sollitto and Pratt's Separate Statement of Undisputed Facts.

### B. Exponentially Increasing Demand Drives Syntax's Efforts To Secure Sufficient Financing

Syntax experienced exponential growth fueled by a worldwide increase in demand for its high definition TVs. In calendar 2006 – the first full year following the merger – Syntax's revenue increased to $242.5 million (up 303% over the prior year period) and its unit shipments expanded to approximately 352,000 units (up 272% over the prior year period). (Cmplt. ¶¶ 54, 141; Doc. 133, Ex. K.) Three months later, in May 2007, the Company again announced record growth, with revenue for the first calendar quarter of 2007 up 257% and shipments up 233% when compared with the prior year period. (Cmplt. ¶ 152; Doc. 133, Ex. L.) To address the working capital needs associated with meeting this higher volume, the Company took a number of concrete steps. One such step was the Company's public offering in May 2007. (Cmplt. ¶¶ 1, 46, 50.)

Fresh off the heels of its record third quarter fiscal 2007, the Company conducted a public offering of 25.6 million shares with the stated "inten[tion] to use the proceeds from this offering to finance our working capital needs associated with continued expansion of our business." (Cmplt. ¶ 50; Doc. 133, Ex. C at S-2.) In the Registration Statement, Prospectus, Preliminary Prospectus Supplement and Prospectus Supplement (together, the "Offering Documents"), as well as the public filings incorporated in those documents, Syntax uniformly emphasized that its "lack of capital to date has constrained our business and negatively impacted our profitability," and that if additional financing is not available "we may be unable to expand our business or to develop new business at the rate desired and our operating results may suffer." (*See, e.g.*, Cmplt. ¶¶ 50, 54; Doc. 133, Exs. A at 38, C at S-4.)

The Company also repeatedly disclosed its dependence on its Asian suppliers' access to sufficient working capital. For example, in its 2006 annual report, incorporated by reference in the Offering Documents, the Company expressly warned that its virtual manufacturing model "exposes us to vulnerability owing to our dependence on a few contract manufacturers or assemblers." (Cmplt. ¶ 54; Doc. 133, Ex. A. at 7.) It cautioned

that "[t]he loss of our relationships with our contract manufacturers, particularly Kolin, or their inability to conduct their manufacturing and assembly services for us as anticipated ... could adversely affect our ability to fill customer orders" and "the resulting decline in revenue and revenue potential would harm our business." (*Id.* at 15.) Additionally, the Company warned that "if sufficient supply chain financing is not available to our suppliers and contract manufacturers, we would need to curtail our growth rate in order to have access to sufficient supply of product." (Cmplt. ¶ 54; Doc. 133, Ex. D at 30.)

       Thus, in connection with its May 2007 public offering, the Company made very clear that financing its explosive growth was a severe challenge to its business.

### C. Demand For Syntax's Products Remains Strong, But A Credit Crisis In Asia Cripples The Company's Ability To Meet Demand

       Two months after its public offering, on July 16, 2007 Syntax reported that revenue and margins for fiscal 2007 (ended June 30, 2007) had met previously issued guidance. And reflective of the "strong demand for our products," Syntax increased its guidance for calendar year 2007 revenue from its May 2007 estimate of $950 million to $1.1 billion to a revised range of $1.1 to $1.3 billion. (Cmplt. ¶ 162) In addition, the Company reported that, as promised, it had collected $129.6 million in cash from its Asian product partner, South China House of Technology ("SCHOT"), bringing current all accounts receivable amounts owed by SCHOT. (*Id.*)

       Despite the continued strong demand for Syntax's products, in September 2007 a severe credit tightening in Asia left the Company's suppliers with insufficient working capital and unable to supply the Company with sufficient product to meet demand. Although it had no legal obligation to do so, in September 2007 the Company publicly announced that due to the abrupt interruption in supply it would be unable to achieve its upwardly revised calendar year 2007 revenue projections; rather, it expected to achieve revenue totals at the higher end of its May 2007 estimate – $1.0 to $1.1 billion. (Cmplt. ¶ 60.) Consistent with the risks previously disclosed to investors, Syntax explained that its decision to lower its guidance to the upper end of its May 2007 estimate "is reflective of a

severe tightening of credit in Asia that has significantly impacted the bank and other credit facilities of our supply chain partners." (*Id.*) On the conference call with analysts that same day, Sollitto explained that "right now the demand for Olevia is still significantly higher than we're able to provide" and that "we have standing orders from at least half a dozen national retailers for substantially more product than we have currently in our pipeline." (Cmplt. ¶ 169.) He further explained that because the Company's "supply chain partners have seen their borrowing power impacted" by the Asian credit tightening, "we find our growth limited by our current level of working capital." (*Id.*; UF, Ex. C at 5.) Consistent with the sudden interruption in supply, the very next day, on September 13, 2007, Syntax reported for the first time a substantial backlog of $42.4 million in orders. (Doc. 133, Ex. E at 12.)

Over the next several months, the Company and its suppliers continued to look for solutions to secure adequate financing to meet demand. But, with the continuing deterioration in the credit markets, the Company was unable to secure the necessary working capital and eventually was forced to seek Chapter 11 protection on July 8, 2008. Further evidence of the severity of the Asian credit crisis is the fact that Kolin, the Company's primary Asian supplier, was also forced to seek bankruptcy protection in the fall of 2008 due to its own inability to obtain sufficient working capital.

### D.  Plaintiffs' Theory Of Loss

The claims remaining against Sollitto and Pratt are brought under Sections 11, 12 and 15 of the Securities Act on behalf of a class of investors who purchased Syntax stock directly from the Company's May 2007 public offering. Plaintiffs' liability theory is that the Offering Documents failed to disclose that Chinese demand for Syntax's televisions was "much weaker than what investors were led to believe." (Cmplt. ¶ 8.) Plaintiffs further claim that this alleged weak Chinese demand was concealed from investors through two alleged "accounting schemes." (Cmplt. ¶ 74.) Plaintiffs allege that to inflate its reported revenue, the Company improperly and prematurely recognized revenue on sales to SCHOT, when those transactions should have been treated as consignments. (*Id.*) In

addition, plaintiffs allege Syntax artificially inflated its margins and earnings by improperly accounting for "tooling deposits" and vendor credits from its primary Asian supplier, Kolin. (*Id.*)

But plaintiffs' theory of loss is untenable, as there is no connection between Syntax's public disclosures and the declines in Syntax's stock price, which plaintiffs seek to recover. (Cmplt. ¶¶ 15-19.) Specifically, plaintiffs point to disclosures made by Syntax on two separate days – September 12, 2007 and November 14, 2007 – and claim that they revealed the alleged misrepresentations and corresponded with declines in Syntax's stock price. (*Id.* at 18-19.) On neither day, however, did Syntax disclose any information which revealed any of the alleged misrepresentations purportedly contained in the Offering Documents. (UF ¶¶ 1-4.)

In fact, on September 12, 2007, the date the Complaint claims the "[t]ruth [b]egins to [e]merge," not only did Syntax not disclose any weakness in demand for its products in China, the Company actually reiterated that demand in China and elsewhere remained strong. (UF ¶ 1 and Exs. A, C at 5.) Further, nothing in the Company's September 12 disclosures made any mention of any the supposed accounting schemes employed to conceal the alleged weaker than reported Chinese demand. (UF ¶ 2.)[2]

Indeed, far from disclosing weakening demand or accounting schemes, on September 12, Syntax reported its full results for fiscal year 2007 (ended June 30, 2007), disclosing that its revenue had mushroomed to $697.6 million (up 261% over the prior year) and that its earnings per share had rocketed to $0.48 per share (up from a loss of

---

[2] In contrast, what the Company actually did disclose on September 12 was that "[d]emand for Olevia in China is extremely high" and that it was "modeling to grow at just under 100%" in China over the next quarter. (Cmplt. ¶ 171; *see also* UF, Ex. C at 5, 13.) And in explaining its decision to lower its 2007 calendar year guidance to the upper end of its May 2007 estimate, the Company made clear that "demand continues to outstrip our sourcing capabilities," but that the guidance revision resulted from "a severe tightening of credit in Asia that has significantly impacted the bank and other credit facilities of [Syntax's] supply chain partners." (UF, Ex. A.)

Although it is not defendants' burden to establish the precise cause of the stock price decline the following trading day, from all indications it appears it was the disclosure of Syntax's supply constraints and their likely effect on the Company's future revenues that caused Syntax's stock price to fall the next day.

$0.46 per share the prior year). (Cmplt. ¶ 60; UF, Ex. A.) In addition, Syntax reiterated that SCHOT had become current on its accounts receivable and that all amounts noted as past due in the Offering Documents had been paid. (*Id.*)[3] [4]

Similarly, Syntax's November 14, 2007 disclosure did not reveal any information relating to plaintiffs' claimed misrepresentations. (UF ¶¶ 3-4.) Although the Complaint claims the remaining "truth" was revealed in Syntax's Form 10-Q filed that day, plaintiffs cite no excerpt in that public filing which discloses any information revealing their theory of weak Chinese demand or the supposed accounting schemes employed to conceal it. (*Id.*)

Thus, plaintiffs' theory of loss is premised on purportedly "corrective" disclosures which were unrelated to the alleged misrepresentations supposedly contained in the Offering Documents.

### III. ARGUMENT

Summary judgment is appropriate if the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). To avoid summary judgment, the nonmoving party must produce evidence and "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Allegations in the complaint, unsupported speculation, and conclusory statements cannot defeat summary judgment. *See Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir.

---

[3] Other disclosures by Syntax on September 12 included that the Company experienced a decrease in warranty expense and an increase in income tax expense, which "had an immaterial impact" and that its CFO, Wayne Pratt, was planning to step down at the end of September to take "a position working with a longstanding colleague at a start-up company." (Cmplt. ¶ 166; UF, Exs. A and B.)

[4] The Complaint also points to disclosures of internal controls deficiencies in the Company's annual report filed after the close of trading the next day, on September 13, 2007. (Cmplt. ¶ 61.) Not only were these disclosures unrelated to the supposed misrepresentations purportedly contained in the Offering Documents, they also could not have caused any stock price declines on September 13 because they were made public <u>after</u> close of trading on September 13. Any impact from these disclosures would thus be seen the following trading day, September 14, and on that day Syntax's stock price actually increased from $4.01 to $4.11, or 2.49%. (Doc. 133, Ex. H.)

2003); *Nelson v. Pima Community College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996).

Sollitto and Pratt are entitled to summary judgment because plaintiffs' theory of loss is wholly unrelated to any claimed misrepresentations in the Offering Documents.

### A. The Alleged Misrepresentations In Syntax's Offering Documents Did Not Cause Plaintiffs' Loss

As the Supreme Court has explained, the federal securities laws were not intended "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 344 (2005). Thus, to ensure that recovery is awarded only for damages resulting from defendants' misrepresentations, and not for economic losses based on investment risks assumed by investors, recovery is limited to "the loss the purchaser sustains when the facts become generally known and as a result share value depreciates." *Id.* (internal citation, quotes and ellipsis eliminated); *In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (explaining that under the federal securities laws, "[p]laintiffs' economic loss was not that they purchased stock at inflated prices; rather, their economic loss was the decline in their stock value that was the direct result of [defendants'] misrepresentations.")

In Section 11 and 12 claims, losses not directly caused by defendants' alleged misrepresentations are not recoverable as a matter of law. 15 U.S.C. § 77k(e)(3); 15 U.S.C. § 77l(b). Whether the lack of loss causation is raised as an affirmative defense to Section 11 and 12 claims, or as a missing element of plaintiffs' prima facie case in Section 10(b) claims, courts routinely apply the same definition of loss causation in both types of claims. *See, e.g., In re Shoretel Sec. Litig.*, No. C 08-00271, 2009 WL 248326, *5-6 (N.D. Cal. Feb. 2, 2009) (dismissing a Section 11 claim in reliance on the Ninth Circuit's loss causation analysis in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), which involved a Section 10(b) claim); *In re WorldCom, Inc. Sec. Litig.*, Case No. 02 Civ. 3288, 2005 WL 375314, *6 (S.D.N.Y. Feb. 17, 2005) ("the negative causation defense in Section 11 and the loss causation element in Section 10(b) are mirror images").

### 1. Loss Causation Cannot Exist For Stock Losses Resulting From Disclosures Which Do Not "Correct" The Alleged Misrepresentations

It is well settled in the Ninth Circuit that where the disclosures which plaintiffs allege caused the stock price declines do not "correct" the alleged misrepresentations, those misrepresentations could not have caused plaintiffs' loss. *See, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (explaining loss causation requires that the "market learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of defendant's poor financial health generally"); *Daou Systems*, 411 F.3d at 1026 (9th Cir. 2005) (holding that "if the improper accounting did not lead to the decrease in [the company's] stock price, plaintiffs' reliance on the improper accounting in acquiring the stock would not be sufficiently linked to their damages").[5]

The Ninth Circuit's decision in *Metzler* is particularly instructive. There, plaintiffs alleged that defendant Corinthian Colleges had fraudulently inflated its student enrollment numbers to obtain additional federal funds, thereby inflating its revenue and earnings. *See Metzler*, 540 F.3d at 1056-57. As here, plaintiffs pointed to two disclosures – on June 24, 2004 and August 2, 2004 – and claimed that together they "revealed the truth regarding [the Company's] fraudulent practices." *Id.* at 1059. In particular, the June 24 disclosure was a newspaper article which disclosed an investigation by the Department of Education into one of Corinthian's campuses. *Id.* at 1059. And the August 2 disclosure was a release

---

[5] The Ninth Circuit's decisions in *Corinthian Colleges* and *Daou* are consistent with the other Circuit Courts of Appeal that have considered the issue. *See, e.g., Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d Cir. 2005) (no loss causation where "corrective" disclosure did not reveal to the market the "truth" regarding the alleged misrepresentations); *McKowan Lowe & Co. v. Jasmine, Ltd.*, 231 Fed. App'x. 216, 218 (3d Cir. 2007) (affirming summary judgment on Sections 10(b) and 11 claims where "there [were no] disclosures to the market – direct or indirect – which revealed the truth that was allegedly concealed by misstatements or omissions in [the company's] 1993 registration statement and prospectus."); *Catogas v. Cyberonics, Inc.*, 292 Fed. App'x. 311, 314 (5th Cir. 2008) (loss causation requires "that the market reacted negatively to a corrective disclosure, which revealed the falsity of [the company's] previous representations"); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009) (explaining that "to be corrective, the disclosure ... must at least relate back to the misrepresentation and not to some other negative information about the company.")

by Corinthian that it was reducing its revenue and earnings projections due to a number of factors, including "higher than anticipated attrition." *Id.* at 1059-60. Plaintiffs contended that disclosure of "higher than anticipated attrition" was "a euphemism for an admission that they had enrolled students who should not have been signed up at all." *Id.* at 1060. They argued that together the announcements of the Department of Education investigation and the higher than anticipated attrition had the effect of "peel[ing] back the curtain and reveal[ing] Corinthian's impaired and falsely presented financial condition, leading to the considerable stock drop that caused Plaintiffs' claimed damage." *Id.* at 1060.

The Ninth Circuit disagreed. The Court observed that the June 24 and August 2 disclosures did not "disclose[] – or even suggest[] – to the market that Corinthian was manipulating student enrollment figures company-wide in order to procure excess federal funding, which is the fraudulent activity that Metzler contends forced down the stock that caused its losses." *Id.* at 1063. The Court rejected plaintiff's argument that these disclosures were "understood" by the market to reveal the alleged student enrollment fraud, reasoning that allowing a case "to proceed on such a theory would effectively resurrect what *Dura* discredited – that loss causation is established through an allegation that a stock was purchased at an inflated price." *Id.* at 1064 (noting the perverse result that, under plaintiffs' theory, "[s]o long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud.")

Similarly instructive is *In re Shoretel Sec. Litig*, a recent decision from a court in this Circuit dismissing a Section 11 claim for lack of loss causation. There, as here, plaintiffs alleged defendants' misrepresentations were revealed to the market in a press release announcing that the company's results would not meet expectations, yet said "nothing about what was allegedly misrepresented in or omitted from" the Offering Documents. *In re Shoretel Sec. Litig.*, No. C 08-00271, 2009 WL 248326, *5 (N.D. Cal. Feb. 2, 2009). Relying on the Ninth Circuit's loss causation analysis in *Metzler*, the court

- 10 -

dismissed the Section 11 claim for lack of loss causation, explaining:

> By alleging that their losses occurred as a result of the press release – which on its face does not disclose any of the misrepresentations alleged in the Complaint – plaintiffs have shown that the market reacted to defendant's poor financial health [] rather than to a disclosure of the [Offering Documents'] allegedly false and misleading representations.

*Id.* at *5.

### 2. The Undisputed Facts Demonstrate That Both Of The Supposedly "Corrective" Disclosures Were Unrelated To Plaintiffs' Theory of Wrongdoing

The Complaint identifies Company disclosures made on two dates – September 12, 2007 and November 14, 2007 – which plaintiffs argue were "corrective" and corresponded with a decline in Syntax's stock price. (Cmplt. ¶¶ 18-19.) None of these disclosures, however, revealed any new information regarding the alleged misrepresentations purportedly contained in the Offering Documents. (UF. ¶¶ 1-4.) Specifically, the Company's disclosures on these dates made no mention of plaintiffs' weak Chinese demand theory or the alleged accounting schemes supposedly employed to conceal this weakness. (*Id.*) Accordingly, as a matter of law, any stock price declines associated with these disclosures could not have resulted from the alleged misrepresentations in the Offering Documents.

#### a. Syntax's September 12, 2007 Disclosures Were Unrelated To The Alleged Misrepresentations In The Offering Documents

The first disclosures identified in the Complaint as purportedly revealing the "truth" regarding the alleged misrepresentations purportedly contained in the Offering Documents were made by Syntax after close of trading on September 12, 2007. (Cmplt.¶ 60.) But, as in *Metzler* and *Shoretel*, nowhere in the September 12 disclosures is there any information revealing plaintiffs' theory that Chinese demand was weaker than previously reported or

- 11 -

that the Company had engaged in accounting schemes to conceal this development. (UF, ¶¶ 1-2.) Rather, the September 12 disclosures informed investors that, *inter alia*, Syntax's calendar year revenue would not be as high as previously predicted due to its suppliers' inability to supply the Company with enough product to meet the growing demand for its products in China and elsewhere. (UF, Exs. A, C at 5, 13.)

As even the Complaint concedes, far from disclosing weakening demand in China, the September 12 disclosures reiterated that "[d]emand for Olevia in China is extremely high" and that the Company was "modeling to grow at just under 100%" in China over the next quarter. (Cmplt. ¶ 171.) The Complaint also concedes that the Company attributed its decision to lower its revenue guidance to the upper end of its May 2007 estimate due to "a severe tightening of credit in Asia that has significantly impacted the bank and other credit facilities of our supply chain partners." (Cmplt ¶ 60.) Thus, it is wholly inconsistent for plaintiffs to suggest that these September 12 disclosures somehow revealed weak demand for Syntax's products in China. Similarly, Syntax's September 12 disclosures included no disclosure of the alleged accounting schemes supposedly employed to conceal the alleged weaker than reported Chinese demand. (UF ¶ 2.)[6]

The fact that nothing in the Company's September 12 disclosures corrected any of the alleged misrepresentations purportedly contained in the Offering Documents ends the inquiry and mandates summary judgment on any claimed losses resulting from stock price

---

[6] As previously noted, the announcement that Pratt was stepping down as CFO to pursue an opportunity at a private company was also made on September 12. (See supra, n. 3.) But, this disclosure is irrelevant as a matter of law, as without any mention that Pratt's departure was in any way related to the alleged misrepresentations, the mere announcement that he was stepping down could not have "corrected" the alleged misrepresentations in the Offering Documents. *See, e.g., In re VeriSign, Inc., Deriv. Litig.*, 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007) (holding, "[t]he announcement of the resignations of [defendants] is meaningless for purposes of showing loss causation" because, *inter alia*, "there is no indication [] that [the company] announced that [defendants] had resigned because they were involved in [the alleged wrongdoing]."); *In re Omnicom Group, Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008) (holding a defendant's "resignation cannot constitute a corrective disclosure when the resignation is not connected to the alleged fraud."); *See also In re Buca Inc. Sec. Litig.*, Case No. 05-1762, 2006 WL 3030886, *9 (D. Minn. Oct. 16, 2006) (finding no loss causation where the press release announcing the CEO's "resignation mentioned no investigation or accounting issues and thus disclosed nothing of the alleged fraud.").

- 12 -

1  declines the following trading day.

2  Indeed, this case is a classic example of a plaintiff's attempt to isolate a trading day associated with stock price declines and concoct a theory that the declines are somehow attributable to misrepresentations. But where, as here, the disclosure causing the stock drop merely announces poor financial results unrelated to the supposed misrepresentations, courts have routinely held there can be no loss causation. *See Metzler*, 540 F.3d at 1063 (loss causation requires "that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally."); *Lory v. Ryan*, No. CV07-2174-PHX-NVW, 2008 WL 4630306, *4 (D. Ariz. Oct. 20, 2008) (Wake, J.) (explaining, "the fact that the share price declined after [the company] declared bankruptcy and revealed that the company was out of money" could not provide a "causal link between [the alleged] statements and the [s]hareholders' loss"); *In re Downey Sec. Litig.*, Case No. CV 08-3261, 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) (explaining, "the public disclosures referenced in the [complaint] do not contain a disclosure of wrongdoing, and, at best, demonstrate only that the market learned of and reacted to Downey's 'poor financial health' rather than any alleged fraud.").

At best, all plaintiffs are left with here is that the market reacted to the portion of the September 12 disclosures which lowered the Company's calendar year revenue projections. (Cmplt. ¶ 18.) But, as this Court has already determined in its Order on defendants' motions to dismiss, Syntax's previous revenue projections which were revised by the September 12 disclosures are insulated from liability by the PSLRA safe harbor and, thus, are not actionable under the federal securities laws. (Doc. 198 at 12-13.) And, in any event, as the September 12 disclosures only revised the Company's revenue projections back to the upper end of the projections in place at the time of the May 2007 public offering, they could not have corrected anything in the Offering Documents.

### b. Syntax's November 14, 2007 Disclosure Was Unrelated To The Alleged Misrepresentations In The Offering Documents

The Complaint alleges the remaining "truth" regarding the alleged misrepresentations in the Offering Documents was revealed after close of trading on November 14, 2007 in Syntax's Form 10-Q. (Cmplt.¶ 19.) Here again, much like *Metzler* and *Shoretel*, Syntax's November 14 disclosure offered no new information revealing weaker than previously reported Chinese demand or the accounting schemes supposedly employed to conceal it. (UF ¶¶ 3-4.)

As with its September 12 disclosures, Syntax's November 14 disclosure was unrelated to the claimed misrepresentations in the Offering Documents. The Company's November 14 disclosure contained no new information regarding plaintiffs' theory of weak demand in China. (UF ¶ 3.) And nothing in the November 14 disclosure made any mention of plaintiffs' theorized accounting schemes relating to sales to SCHOT or tooling deposits with Kolin. (UF ¶ 4.) Indeed, far from disclosing that Syntax's sales to SCHOT were consignments, the November 14 disclosure actually stated the opposite. In particular, on November 14, the Company reported its sales to SCHOT in its accounts receivable. (UF, Ex. D at 6-7.) Such accounting treatment is wholly inconsistent with a consignment arrangement and thus could not have informed the market that, as plaintiffs suggest, these sales were really consignments.[7]

### B. Sollitto And Pratt Are Also Entitled To Summary Judgment On Plaintiffs' Control Person Claim

The Complaint purports to allege a "control person" claim under Section 15 of the

---

[7] Further, the November 14 disclosure that the Company's Chief Accounting Officer had stepped down a month earlier and that then-CFO John Hodgson had assumed the position is unrelated to plaintiffs' claimed misrepresentations in the Offering Documents. (UF ¶¶ 3-4, Ex. D at 19.) As with the September 12 disclosure of Pratt's departure, the November 14 disclosure of the Chief Accounting Officer's departure is "meaningless for purposes of loss causation" because there is no indication that he "had resigned because [he was] involved in [the alleged wrongdoing]." *See VeriSign*, 531 F. Supp. 2d at 1208; *Omnicom*, 541 F. Supp. 2d at 553.

Securities Act. (Cmplt. ¶¶ 133-136.) But, Sollitto and Pratt are entitled to summary judgment on plaintiffs' control person claim where, as here, for reasons set forth in Part III.A, plaintiffs' alleged primary violations fail. *See Paracor Finance, Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir. 1996). Accordingly, Sollitto and Pratt are also entitled to summary judgment on plaintiffs' Section 15 claim.

## IV. CONCLUSION

For all of the foregoing reasons, defendants Sollitto and Pratt respectfully request that the Court grant summary judgment as to all remaining claims asserted against them pursuant to Rule 56 of the Federal Rules of Civil Procedure.

DATED this 8th day of September, 2009.

SNELL & WILMER L.L.P.

By: s/Joseph G. Adams
Joel P. Hoxie
Patricia Lee Refo
Joseph G. Adams
One Arizona Center
400 E. Van Buren
Phoenix, AZ  85004-2202

-and-

Daniel P. Lefler
Craig I. Varnen
Shaunt T. Arevian
IRELL & MANELLA L.L.P.
1800 Ave of the Stars, Suite 900
Los Angeles, CA 90067

Attorneys for Defendants
Vincent F. Sollitto, Jr. and Wayne Pratt

## CERTIFICATE OF MAILING

I hereby certify that on September 8, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants on record.

By  s/Joseph G. Adams

10514839