1   BUCKLEY KING
    MICHAEL SALCIDO
2   2020 North Central Avenue, Suite 1120
    Phoenix, AZ 85004
3   Telephone: 602/424-2550
    602/424-2566 (fax)
4   salcido@buckleyking.com

5   Liaison Counsel

6   COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
7   G. PAUL HOWES
    SCOTT H. SAHAM
8   DEBRA J. WYMAN
    DANIEL S. DROSMAN
9   SAMANTHA A. SMITH
    SHANNON M. MATERA
10  JENNIFER Y. LAI
    655 West Broadway, Suite 1900
11  San Diego, CA 92101
    Telephone: 619/231-1058
12  619/231-7423 (fax)                          COUGHLIN STOIA GELLER
    paulh@csgrr.com                                RUDMAN & ROBBINS LLP
13  scotts@csgrr.com                             EX KANO S. SAMS II
    debraw@csgrr.com                             9601 Wilshire Blvd., Suite 510
14  dand@csgrr.com                               Los Angeles, CA 90210
    ssmith@csgrr.com                             Telephone: 310/859-3100
15  smatera@csgrr.com                            310/278-2148 (fax)
    jlai@csgrr.com                               exkanos@csgrr.com
16
    Lead Counsel for Plaintiffs
17
    [Additional counsel appear on signature page.]
18
                        UNITED STATES DISTRICT COURT
19
                            DISTRICT OF ARIZONA
20
    TEIMURAZ TSIREKIDZE, On Behalf of  )   No. 2:07-cv-02204-FJM
21  Himself and All Others Similarly Situated, )  **(Consolidated)**
                                       )
22                          Plaintiff, )   CLASS ACTION
                                       )
23          vs.                        )   PLAINTIFFS' OPPOSITION TO
                                       )   DEFENDANTS SOLLITTO AND
24  SYNTAX-BRILLIAN CORP., et al.,     )   PRATT'S MOTION FOR SUMMARY
                                       )   JUDGMENT
25                         Defendants. )
                                       )
26  _____)

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   STATEMENT OF FACTS ............................................................................. 2

III.  STANDARD FOR SUMMARY JUDGMENT ........................................... 9

IV.   ARGUMENT ................................................................................................. 9

      A.   A Genuine Issue of Fact Exists for Plaintiffs' §11 Claims Against
           Defendants ............................................................................................ 9

      B.   A Genuine Issue of Fact Exists Regarding Whether Defendants'
           Misrepresentations in the SPO Caused Losses to Plaintiffs and the
           Class .................................................................................................. 11

           1.   Courts Have Rejected Defendants' Loss Causation Theory
                that Corrective Disclosures Must Mirror the
                Misrepresentations Alleged Fact for Fact ...................................... 12

           2.   The Losses Suffered by Plaintiffs and the Class Are Related
                to Defendants' Misrepresentations in the SPO ............................... 15

      C.   A Genuine Issue of Fact Exists for Plaintiffs' Control Person Claims
           Against Defendants .............................................................................. 16

V.    CONCLUSION ............................................................................................ 17

1

# TABLE OF AUTHORITIES

2

**Page**

3

**CASES**

4

*Adair v. Kaye Kotts Assocs.,*
    No. 97 Civ. 3375 (SS), 1998 U.S. Dist. LEXIS 3900
5
    (S.D.N.Y. Mar. 27, 1998) .......................................................................... 9

6

*Akerman v. Oryx Commc'ns Inc.,*
    810 F.2d 336 (2d Cir. 1987) ................................................................... 11
7

*Alaska Elec. Pension Fund v. Flowserve Corp.,*
8
    572 F.3d 221 (5th Cir. 2009) ................................................. 9, 10, 12, 14

9

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) .................................................................................. 9
10

*Basic Inc. v. Levinson,*
11
    485 U.S. 224 (1988) ........................................................................... 12, 13

12

*Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) ............................................................ 13, 14
13

*Celotex Corp. v. Catrett,*
14
    477 U.S. 317 (1986) .................................................................................. 9

15

*Collins v. Signetics Corp.,*
    605 F.2d 110 (3d Cir. 1979) ................................................................... 12
16

*Consol. Elec. Co. v. U.S.,*
17
    355 F.2d 437 (9th Cir. 1966) .................................................................... 9

18

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005) ........................................................................... 12, 13
19

*Escott v. BarChris Construction Corp.,*
20
    283 F. Supp. 643 (S.D.N.Y. 1968) ......................................................... 11

21

*Feit v. Leasco Data Processing Equip. Corp.,*
    332 F. Supp. 544 (E.D.N.Y. 1971) ......................................................... 11
22

*Fox v. Citicorp Credit Servs.,*
23
    15 F.3d 1507 (9th Cir. 1994) .................................................................... 9

24

*Giles v. GMAC,*
    494 F.3d 865 (9th Cir. 2007) .................................................................... 9
25

*Herman & MacLean v. Huddleston,*
26
    459 U.S. 375 (1983) ................................................................................ 10

27

*Howard v. Everex Sys.,*
    228 F.3d 1057 (9th Cir. 2000) ................................................................ 16
28

1

2                                                                           **Page**

3   *In re Adams Golf, Inc.,*
       618 F. Supp. 2d 343 (D. Del. 2009) ...................................................... 16
4

5   *In re Daou Sys.,*
       411 F.3d 1006 (9th Cir. 2005) ................................................... 12, 13, 14

6   *In re Gilead Scis. Sec. Litig.,*
       536 F.3d 1049 (9th Cir. 2008) ........................................................ 13, 14
7

8   *In re Homestore.com, Inc. Sec. Litig.,*
       347 F. Supp. 2d 769 (C.D. Cal. 2004) ............................................ 16, 17

9   *In re Motorola Sec. Litig.,*
       505 F. Supp. 2d 501 (N.D. Ill. 2007) .................................................. 16
10

11   *In re Scottish Re Group Sec. Litig.,*
       524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................ 16

12   *In re Shoretel Inc. Sec. Litig.,*
       No. C 08-00271 CRB, 2009 U.S. Dist. LEXIS 11151
13        (N.D. Cal. Feb. 2, 2009) ...................................................................... 14

14   *In re Williams Sec. Litig. – WCG Subclass,*
       558 F.3d 1130, 1140 (10th Cir. 2009) ............................................ 14, 17
15

16   *In re WRT Energy Sec. Litig.,*
       No. 96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 18701
17        (S.D.N.Y. Aug. 30, 2005) .................................................................... 15

18   *Komie v. Saxton,*
       No. 07-15764, 2008 U.S. App. LEXIS 10585
19        (9th Cir. May 12, 2008) ................................................................. 13, 14

20   *Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
       540 F.3d 1049 (9th Cir. 2008) ............................................................ 14

21   *Middlesex Ret. Sys. v. Quest Software, Inc.,*
       No. CV 06-6863 DOC (RNBx), 2008 U.S. Dist. LEXIS 68419
22        (C.D. Cal. July 10, 2008) .................................................................... 16

23   *Miller v. Asensio & Co.,*
       364 F.3d 223 (4th Cir. 2004) .............................................................. 12
24

25   *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,*
       96 F.3d 1151 (9th Cir. 1996) .............................................................. 16

26   *Stuart v. Radioshack Corp.,*
       No. C-07-4499 EMC, 2009 U.S. Dist. LEXIS 84804
27        (N.D. Cal. Aug. 28, 2009) ..................................................................... 9

28

1

2                                                                    **Page**

3  **STATUTES, RULES AND REGULATIONS**

4  15 U.S.C.

        §77k(a) .............................................................................. *passim*
5       §77k(e) .................................................................................... 11
        §78j(b) ..................................................................................... 12
6
    Federal Rules of Civil Procedure
7       Rule 56(c) .................................................................................. 9

8  17 C.F.R.
        §230.405 ................................................................................... 16

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Lead Plaintiff City of St. Clair Shores Police and Fire Retirement System and Named

2    Plaintiff City of New Haven Policemen's and Firemen's Pension Fund ("New Haven")

3    (collectively "plaintiffs") hereby oppose Defendants Sollitto and Pratt's Motion for

4    Summary Judgment ("Motion"), Doc. 317.

5    **I.    INTRODUCTION**

6    Ignoring the wealth of evidence demonstrating their involvement in the wrongdoing

7    that led to the collapse of Syntax-Brillian Corporation ("Syntax-Brillian" or the "Company"),

8    former Chief Executive Officer ("CEO") and Board Chairman Vincent F. Sollitto, Jr.

9    ("Sollitto") and former Chief Financial Officer ("CFO"), Vice President, Secretary and

10   Treasurer Wayne A. Pratt ("Pratt") (collectively "defendants") ask the Court to dismiss as a

11   matter of law the claims brought against them under §11 of the Securities Act of 1933

12   ("Securities Act").[1]   Defendants raise only one ground to support their Motion: the

13   affirmative defense of negative causation.  This affirmative defense places a heavy burden on

14   defendants – not plaintiffs – to prove that the decline in the value of Syntax-Brillian's stock

15   price resulted solely from factors other than the alleged misrepresentations and omissions.

16   Defendants have failed to satisfy their heavy burden.  Through this opposition,

17   plaintiffs have submitted substantial evidence demonstrating that genuine issues of fact exist

18   regarding defendants' liability under §11 and that the alleged misrepresentations caused the

19   losses suffered by plaintiffs and the class.  Indeed, plaintiffs have submitted the opinions of

20   two experts who have opined that defendants failed to exercise reasonable care in conducting

21   due diligence regarding the Company's May 24, 2007 secondary public offering ("SPO")

22   and that Syntax-Brillian's stock price declines after the Company's September 12, 2007 and

23   November 14, 2007 disclosures were related to the alleged misrepresentations and

24   omissions.  Accordingly, the Court must deny defendants' Motion.

25

26   [1]    Former Chairman of the Audit Committee of Syntax-Brillian's Board of Directors and
     director John S. Hodgson ("Hodgson") filed a joinder in defendants' Motion.  Doc 320.
27   Plaintiffs' arguments apply equally to Hodgson.  All "Doc." references are to entries on the
     court's Electronic Case Filing system.

28

1    **II.    STATEMENT OF FACTS**

2          This is an extremely strong case of liability.  Syntax-Brillian manufactured high

3    definition televisions under the brand name Olevia.   In Asia, Syntax-Brillian sold its

4    televisions through the South China House of Technology ("SCHOT") and Olevia Far East

5    ("OFE").  Taiwan Kolin Ltd. ("Kolin") – a related party of Syntax-Brillian – served as the

6    principal contract manufacturer of Syntax-Brillian's televisions.

7          Syntax-Brillian devised several accounting schemes that directly led to the

8    Company's collapse and bankruptcy.  For example, Syntax-Brillian prematurely recognized

9    revenue on transactions with SCHOT in violation of Generally Accepted Accounting

10   Principles ("GAAP").  Syntax-Brillian's purported sales to SCHOT constituted as much as

11   40% to 50% of the Company's total sales volume in some periods.  ¶76.[2]  In connection with

12   the Company's bankruptcy proceedings, James Feltman ("Feltman"), an independent

13   bankruptcy examiner, presented the conclusions of an investigation that he and his team

14   conducted of Syntax-Brillian.  Feltman found that "[a]t the time that Syntax-Brillian was

15   invoicing SCHOT and Olevia Far East, it was purporting to sell televisions which didn't

16   exist because a completed 65-inch television weighs 235 pounds and the packages that were

17   being sent from Kolin weighed a fraction of that."[3]  Indeed, Syntax-Brillian's shipments to

18   SCHOT amounted to nothing more than consignments sales in Asia that allowed the

19   Company to improperly recognize revenue.  ¶¶76-86.  Feltman concluded:

20              These types of document[s], Your Honor also raise questions to me about the
              integrity and motivation of certain of the corporate officers and certain of the
21            Syntax-Brillian's trading partners which I previously described suppliers and
              vendors because they must have known at the time that the documents that
22            they were trading were not complete, did not represent finished goods and did
              not represent , at least at that time, a genuine economic obligation to perform
23            under those documents.

24   ─────────────────────

25   [2]      Unless otherwise specified, all paragraph ("¶") references are to the Consolidated
     Class Action Complaint for Violations of the Federal Securities Laws ("CC"), Doc. 96.  All
26   "Doc." references are to entries on the court's Electronic Case Filing system.

27   [3]      Proposed Consolidated Amended Class Action Complaint for Violations of the
     Federal Securities Laws ("CAC"), ¶¶4, 211-21, Doc. 205.

28

CAC, ¶5.  John Orenstein ("Orenstein"), the Company's appointed examiner who also conducted an examination of Syntax-Brillian's accounting, confirmed the same conclusions and stated "[when] you put all this together and you really are struck by the notion that there was something very wrong with the booking of sales and receivables in the case of [SCHOT] and OFE."  CAC, ¶6.

The Company also created false accounting entries called "tooling deposits" that were purportedly payments to Kolin for the creation of molds to manufacture television frames. However, Gregory Rayburn ("Rayburn"), the Company's CEO after February 9, 2007 through November 14, 2007 (the "Class Period"), testified during a bankruptcy proceeding that the "tooling deposits" were not "tooling deposits" and that Kolin was not a manufacturer of television molds.  CAC, ¶3.  Rayburn stated the notion that millions and millions went for tooling is wrong – it just went.  *Id.*  In further testimony, Rayburn added that the "account entry called tooling deposits is – were invoices that were for – were labeled various and those payments were directly to Kolin.  So they don't represent tooling deposits . . . it had nothing to do with the molds."  *Id.*  Syntax-Brillian created these fictitious "tooling deposits" and improperly recognized revenue on transactions with SCHOT to enable the Company to artificially inflate its revenues, profit margins and earnings per share during the Class Period and to raise more than $143 million through its May 24, 2007 SPO that incorporated the Company's false financial statements.  ¶¶2, 87-96; CAC, ¶¶222-27.

Demonstrating the severity of Syntax-Brillian's improper accounting practices, the Department of Justice, the Internal Revenue Service and the Postal Inspection Service created a fraud task force specially designed to investigate the Company's funneling of $140 million to Kolin and the falsification of its financial reports.  Declaration of Ex Kano S. Sams II in Support of Plaintiffs' Opposition to Defendants Sollitto and Pratt's Motion for Summary Judgment ("Sams Decl."), Exhibit (Ex.") 1.  Kolin, moreover, was delisted from the Taiwan Stock Exchange and Taiwanese prosecutors raided its office because of accounting discrepancies between Kolin and Syntax-Brillian.  *Id.*  Additionally, the Securities and Exchange Commission ("SEC") sent Syntax-Brillian a letter of inquiry,

1    focused upon the "various financial and accounting issues beginning July 1, 2005, including

2    the accounting treatment of tooling deposits, cash advances to Asian manufacturers,

3    outstanding accounts receivable, inventory returns, internal control issues, and [the

4    Company's] supply chain relationships in Asia."   ¶14.   Indeed, during a bankruptcy

5    proceeding, Syntax-Brillian's own attorney admitted "I think we were very candid with the

6    Court that we thought there was a possibility of fraud from the beginning."  CAC, ¶226.

7           Overwhelming evidence demonstrates defendants' wrongdoing.  For example, in a

8    September 26, 2005 e-mail from Robert Chiu ("Chiu"), a partner of Asian practice at

9    Grobstein, Horwath & Company LLP ("Grobstein"), to former President, Chief Operating

10   Officer ("COO") and director James Ching Hua Li ("Li"), former Chief Procurement Officer

11   and director Man Kit (Thomas) Chow ("Chow") and others, Chiu wrote:

12           *We all know that "revenue recognition" is and has been a HOT topic
13   in the eyes of the SEC.  In their eyes on this area, there is no grey area.
     They will not accept any act or questionable act from the management to
14   manipulate the revenue to either direction.*

             *On the sales made to BDI [Laguna] on June 30, 2005, after reviewing
15   all of the facts and data from your office (including the letter from BDI), it
     will be hard press[ed] to argue that throughout all year, both companies
16   have been operating on a FOB destination but not on those sales made on
     the last day of the fiscal year.*

17           *You can argue all day if you want to that both parties had made the
18   SAME mistakes on the purchase order and sales invoice.  But I can tell you
     that upon a full review by the SEC, your argument will not pass the "smell
19   test".*

20           Second issue is on the provision on the price protection on sales made
21   to major customers like Target and CompUSA in the month of April through
     June.

22                        *        *        *

23           *We all can see that all along you have been issuing price protection to
24   your customers.  So now at the end of the fiscal year end audit, you are now
     telling us that there would be NO price protection to be issued for the sales
25   made in April, May and June just will not passed [sic] the "smell test" again
     in the eyes of SEC.  To them it is just another act by the management to
26   manipulate the revenue or net profit or loss.*

27

28

1   AOB010433-35 at 33-34, Sams Decl., Ex. 2.[4]  Li responded to Chiu and copied Chow, CFO

2   Pratt and others and stated that he fully agreed with Chiu's description of the issues related to

3   the Company's improper accounting practices.  *Id.*   Additionally, in an e-mail dated

4   November 9, 2005 from Grobstein Partner Chiu to Chow and copied to CFO Pratt and Mitch

5   Rubin ("Rubin"), a financial consultant for the Company, Chiu wrote:

6           Price protection received from Kolin for the three months ended June
        30, 2005 amounted to $13,411,950 or 39% of gross sales.  Price protection for
7       the year ended June 30, 2005 amounted to $27,910,000 or 26% of gross sales.
        This represents an increase of 13% of price protection on gross sales form
8       June '05 to September '05 and a resulting additional credit on the P/L of
        $1,743,554.
9
            This obviously has a positive impact on the gross profit percentage and
10      pretax income for the three months ended September 2005.  Gross profit
        percentage at June 2005 was 13% compared to 20% at September 2005.
11
            ***Is it reasonable and arms length that Kolin would give such volume
12      (39%) of price protection?  Will Syntax have a reasonable and supportive
        explanation when the SEC asks the question as why Kolin is doing this and
13      is this income or equity contribution from Kolin?***

14   AOB004710-11 at 10, Sams Decl., Ex. 3.

15          Other documents further confirm plaintiffs' allegations.  In an e-mail dated February

16   10, 2006, Grobstein partner Chiu wrote to Controller Alice Phang, Chief Procurement

17   Officer Chow and CFO Pratt and said "South China's A/R is getting way too much on the

18   90+ [days delinquent].  We will need much more than 'confidence' as far as collectability."

19   AOB010539, Sams Decl., Ex. 4.  In an e-mail dated July 6, 2006 with a subject line reading

20   "[d]rop shipments to South China in June 06" from Chiu to Pratt, Phang, and others, Chiu

21   wrote:

22          Wayne [Pratt],

23          ***This does not smell so good***.  First we were told that due to the custom
        issue, sales to South China has [sic] a longer terms of collection so there was
24      [sic] no more sales to them after January 2006.

25          Now all of a sudden on these last minute drop ship sales before the year
        ended, the sales were made to South China.
26

27   [4]     All emphasis is added and citations omitted unless otherwise noted.

28

1    *Were these the only bunch of sales made to South China after*
2    *January 2006 till the end of the fiscal year?  You know how these sales will*
     *smell like now?*

3    GHC 48413-16 at 14, Sams Decl., Ex. 5.

4            Additionally, in a report dated June 30, 2006 entitled "Syntax-Brillian Corporation:

5    Significant Deficiencies Noted in Connection with Financial Statement Audit," Syntax-

6    Brillian's management and audit committee were informed about specific internal control

7    deficiencies considered to be significant deficiencies.  EY 0004221-30 at 21, Sams Decl., Ex.

8    6.  In an e-mail dated July 10, 2006, moreover, John Modlin ("Modlin"), an audit partner at

9    Grobstein, wrote to Noel Chan and Chiu at Grobstein and others and made the following

10   comments regarding Syntax-Brillian's fiscal year 2006 audit:

11           I spoke to Robert [Chiu] about this over the weekend and Robert will
             be talking to Wayne [Pratt] about all this, but here are my initial thoughts.  *I*
12           *would consider the fact that the company cannot provide (or does not*
             *already have) a comprehensive write up of their internal control procedures*
13           *as a reportable condition leading to a possible material weakness.  If they*
             *don't know what their internal controls are, how can they follow them?  At a*
14           *minimum we need to document our understanding of how transactions are*
             *processed and our understanding of their systems.  I assume, at this point,*
15           *we will not rely on their internal controls for audit evidence.  Which may be*
             *a problem in of itself.  Also, I don't know how management will sign their*
16           *certifications on the 10-K.*

17   GHC 48363-66 at 63, Sams Decl., Ex. 7.

18           In an e-mail dated July 27, 2006 from Trevor Sheetz, Vice President of Sales, to COO

19   Li, Chief Procurement Officer Chow and others and copied to CFO Pratt and CEO Sollitto,

20   Sheetz wrote "why do you keep increasing these projection numbers every week?  Can't we

21   find a realistic stable projection and stick with it?  Its [sic] making everyone shake their

22   heads here wondering what you're up to and committing us too that may put us in a bad light

23   with the market with over estimations.  As you know my projection does not meet up with

24   yours."  SBC-0096340-43 at 42, Sams Decl., Ex. 8.  Additionally, in an e-mail chain dated

25   October 11, 2006, CFO Pratt forwarded to COO Li and CEO Sollitto a previous e-mail from

26   Controller Phang that included revised revenue numbers.  Pratt stated to Li and Sollitto

27   "[t]here was approx. $4.9 million of product that shipped in the last week of the quarter that

28   didn't make cut-off."  SBC-29131-33 at 31, Sams Decl., Ex. 9.  Li responded to Pratt and

Sollitto in an e-mail marked high importance stating "*[b]y the way, in order to make our EPS [earnings per share] at around 0.03 level, we should reserve 'less' on the 'sales reserve' item, agree? We can always reserve more within the Dec. quarter FS.*" *Id.*

Other internal documents further illustrate defendants' wrongdoing.  In an e-mail chain dated October 16-17, 2006 marked high importance with a subject line reading "RE: Preliminary FS ended 9/06," Syntax-Brillian management discussed the use of price protection to meet its gross margins as forecasted.  SBC-29087-92 at 87, Sams Decl., Ex. 10. Phang, Chow, and Li discussed providing Pratt with a price protection ("PP") amount and Li suggested that he prefers "to go with $3.5 even [if] it means a lot of net margin for us but it will be safe." *Id.* at SBC-29089-90.  Li explained "[i]t's OK, we could always tell him [Pratt] that we have total of $3.5M PP from Kolin in our pocket to be used if it is necessary. (I think we may need it anyway.)[.]" *Id.* at SBC-29087.  In e-mail chains in October 2006, CEO Sollitto, CFO Pratt, COO Li, Chief Procurement Officer Chow, Controller Phang and Kolin VP Kao discussed booking fictitious "tooling deposits" on the Company's books. SBC-29059-60, Sams Decl., Ex. 11; SBC-29064-65, Sams Decl., Ex. 12; SBC-29066-67, Sams Decl., Ex. 13; SBC-29069-74, Sams Decl., Ex. 14.

More documents confirm plaintiffs' allegations.  In an e-mail dated December 8, 2006, Chiu provided comments to CFO Pratt regarding a draft response to comment letter that the Company received from the SEC.  Chiu wrote "*[t]he way we read the SEC's comment about the inventory reserves, we believe they are questioning earnings to see if there was management manipulation over the inventory reserve.*" GHC 52883-86 at 85, Sams Decl., Ex. 15.  In a document dated March 31, 2007 entitled "Summary Review Memo – 3rd Quarter," Ernst & Young LLP ("E&Y"), the Company's auditor after it replaced Grobstein on December 1, 2006,  noted "recent deterioration of the aging" related to SCHOT's accounts receivable,  that Syntax-Brillian "has a large exposure outstanding for one customer, South China House of Technology" and that E&Y "issued a significant deficiencies letter to management (which was communicated to the Audit Committee)

1  regarding the financial statement close process." EY-0012318-25 at 20, 24, Sams Decl., Ex.

2  16.

3       In an e-mail chain dated April 11, 2007 with a subject line entitled "SCHOT

4  Receivables," CFO Pratt attempted to obtain answers to questions that he had for Stanley

5  Chan, the CEO of SCHOT. SBC-29124-28 at 24, Sams Decl., Ex. 17. Unsatisfied with the

6  responses he received, Pratt wrote the following to Li, Chow and Sollitto:

7       I understand all of that.

8       Please understand where I am at personally, I am the CFO of the
        company and, as such, people look to me for explanations on this. ***The
9       investors in BRLC [Syntax-Brillian] don't own any of SCHOT's shares.
        The investors in BRLC don't own any of Kolin's shares. The only interest
10      our investors have in our business in Asia is $164.5 million of accounts
        receivable from SCHOT. Therefore, our investors will tend to hold us
11      accountable (as they should) for collection of those receivables. Our
        investors, understandably, are getting a little nervous about having such a
12      large balance due from one company that they know nothing about.*** So they
        ask me questions. If I have no info (committed payment dates, etc.) or if
13      SCHOT is not willing to do something like allowing CIT (or another
        borrower, or US for that matter), to have a security interest in their A/R, then I
14      have nothing to tell the investors when they ask (especially now that they are
        outside of terms).
15
        Second point, the argument that the slow pay of SCHOT is not
16      impacting our ability to provide product to our other customers is incorrect. If
        SCHOT paid us $41 million of cash today (amount that is past due from Nov.
17      shipments), we would be able to pay this to Kolin, and Kolin would be able to
        buy panels, correct?
18
        When did Kolin buy 25% of SCHOT? Per the attached, as of May
19      2006, they didn't own any of SCHOT.

20      James, I understand that Kolin has a lot at stake here too. What I am
        trying to do is make sure we can meet our obligations to our suppliers
21      (INCLUDING Kolin) and our customers, and our shareholders. We are on the
        same page to try to raise the needed cash. ***However, I am not willing to tell
22      everybody this this A/R is OK when I don't have the ammo to support that
        statement***.
23
   *Id.* Additionally, in an e-mail dated February 13, 2008 from Li to Hodgson and others , Li
24
   confirmed that the Company's tooling deposits were fictitious accounting entries:
25
        Jack:
26
        Here is what Roger [Kao] has found in his file. Due to the fact that this
27      was signed long [sic] time ago (Nov. 2004); therefore, it took a while for
        Roger to find it. ***Also, since we never thought that the tooling charges is [sic]
28      something that we are obligated to take care with from very [sic] beginning;***

*thus, this agreement were [sic] never presented and kept in our regular legal file after we merged with Brillian.*

GHC 87930-37 at 30, Sams Decl., Ex. 18.  Sollitto and Pratt's testimony before the SEC also demonstrates their involvement in the Company's improper accounting practices.  Sams Decl., Exs. 19 and 20.

## III.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is a drastic remedy and should be rendered only "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Consol. Elec. Co. v. U.S.*, 355 F.2d 437, 438 (9th Cir. 1966); Fed. R. Civ. P. 56(c).  "Because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences form the facts are jury functions, not those of a judge,' '[t]he evidence of the non-movant is to believed, and all justifiable inferences are to be drawn in his favor.'"  *Giles v. GMAC*, 494 F.3d 865, 872 (9th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Additionally, because negative causation is an affirmative defense under §11, defendants bear the burden of proving beyond peradventure all of the essential elements of the defense to warrant judgment in their favor.  *Fox v. Citicorp Credit Servs.*, 15 F.3d 1507, 1517 (9th Cir. 1994); *Stuart v. Radioshack Corp.*, No. C-07-4499 EMC, 2009 U.S. Dist. LEXIS 84804, at *3 (N.D. Cal. Aug. 28, 2009); *see also  Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir. 2009); *Adair v. Kaye Kotts Assocs.*, No. 97 Civ. 3375 (SS), 1998 U.S. Dist. LEXIS 3900, at *24-*26 (S.D.N.Y. Mar. 27, 1998).

## IV.   ARGUMENT

### A.   A Genuine Issue of Fact Exists for Plaintiffs' §11 Claims Against Defendants

Section 11 imposes liability "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein

not misleading." 15 U.S.C. §77k(a).  "The section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).  "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case."  *Id.* at 382.[5]  "Once a plaintiff establishes a prima facie case under the Securities Act, loss causation is presumed."  *Flowserve*, 572 F.3d at 234. Significantly, scienter is not a requirement for liability under §11 and defendants will be liable for innocent or negligent material misstatements or omissions.  *Herman*, 459 U.S. at 382.  Accordingly, §11 "places a relatively minimal burden on a plaintiff."  *Id.*

Substantial evidence demonstrates that defendants made material misstatements and omissions in the Offering Documents and that defendants failed to exercise reasonable care in conducting due diligence regarding the SPO.[6]  Defendants failed to meet the standard of care and custom and practice for due diligence related to material disclosures applicable to the SPO.  *Id.*; Separate Statement of Disputed and Undisputed Facts in Support of Plaintiffs' Opposition to Defendants Sollitto and Pratt's Motion for Summary Judgment ("Plaintiffs' Separate Statements") Undisputed Item No. 1.  Defendants knew, or should have known in the exercise of reasonable care, that the Offering Documents omitted, misstated and inadequately disclosed information.  Puntillo Report at 8; Plaintiffs' Separate Statement, Undisputed Item No. 2.  Moreover, the omitted, misstated and inadequately disclosed information was of such a nature that a prudent investor would have placed substantial

---

[5]    The Court has previously determined that New Haven purchased securities pursuant to Syntax-Brillian's SPO.  Doc. 296 at 4.

[6]    *See* Expert Report of Richard Puntillo for Individual Defendants ("Puntillo Report") at 8, contained within the Declaration of Richard Puntillo in Support of Plaintiffs' Opposition to Defendants Sollito and Pratt's Motion for Summary Judgment, Ex. A.  The term Offering Documents refers to the Company's Registration Statement dated April 6, 2007, Prospectus dated April 30, 2007, Preliminary Prospectus Supplement dated May 14, 2007 and Prospectus Supplement dated May 23, 2007 and filed May 24, 2007.

1   importance on the information in reaching an investment decision.  Puntillo Report at 8;

2   Plaintiffs' Separate Statement, Undisputed Item No. 3.

3          Specifically, the evidence reveals that there is no record of a reasonable due diligence

4   investigation performed by defendants in connection with tooling and inventory deposits

5   with Kolin or of the use of proceeds from the SPO.  Puntillo Report at 15-21; Plaintiffs'

6   Separate Statement, Undisputed Item Nos. 1-2  The content of the use of proceeds section in

7   the Offering Documents of a public offering is derived from a detailed forecast of cash flow

8   that has been prepared by the issuer and thoroughly vetted by the key executives and others,

9   particularly the CFO.  *Id.*  In order to accurately and completely describe the intended use of

10  proceeds, defendants should have performed a rigorous due diligence on past and expected

11  deposit activity with Kolin.  *Id.*  The case record demonstrates, however, that defendants

12  failed to conduct such due diligence.  *Id.*  As a result of defendants' failure to conduct

13  reasonable due diligence in connection with the SPO, a triable issue of fact exists regarding

14  defendants' liability under §11.  *Escott v. BarChris Construction Corp.*, 283 F. Supp. 643,

15  682-85 (S.D.N.Y. 1968); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544,

16  574-81 (E.D.N.Y. 1971).

17  **B.      A Genuine Issue of Fact Exists Regarding Whether Defendants'**
            **Misrepresentations in the SPO Caused Losses to Plaintiffs and**
18          **the Class**

19         Section 11(e) of the Securities Act provides a means to rebut the presumption of loss

20  causation once plaintiffs establish a *prima facie* case.  Section 11(e) – known as the negative

21  causation defense – provides:

22         [I]f the defendants proves that any portion or all of such damages represents
           other than the depreciation in value of such security resulting from [the] part
23         of the registration statement [that contains the material misstatement or
           omission], . . . such portion of or all such damages shall not be recoverable.
24
25  15 U.S.C. §77k(e).  Thus, under §11, defendants must disprove the presumed casual link

26  between the untrue fact and the "depreciation in value" of the security.  The burden on

27  defendants to prove the affirmative defense under §11(e) is "heavy" and "reflects Congress'

28  desire to allocate the risk of uncertainty to the defendants in these cases."  *Akerman v. Oryx*

- 11 -

1   *Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987); *Flowserve*, 572 F.3d at 234.  To meet

2   their heavy burden, defendants must "prove that the decline in value of [] stock resulted

3   'solely' from factors other than the material omissions" or misstatements.  *Collins v.*

4   *Signetics Corp.*, 605 F.2d 110, 115-16 (3d Cir. 1979); *see also Flowserve*, 572 F.3d at 234

5   (holding that defendants must prove that "the losses were caused by another factor").[7]

6          **1.    Courts Have Rejected Defendants' Loss Causation**
              **Theory that Corrective Disclosures Must Mirror the**
7              **Misrepresentations Alleged Fact for Fact**

8          Defendants contend that the only way that loss causation can be established is if

9   Syntax-Brillian's September 12, 2007 and November 14, 2007 disclosures specifically

10  revealed that the Company had engaged in improper accounting schemes.  Motion at 6-7, 11-

11  14.  Under defendants' approach, they are free to make false and misleading statements, but

12  as long as they do not disclose their wrongful practices when later forced to announce

13  negative financial information, loss causation is not demonstrated.  Such an approach,

14  however, makes it impossible to demonstrate loss causation without an admission or fact-for-

15  fact disclosure of wrongdoing, and is at odds with the Supreme Court's decisions in *Dura*

16  *Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and *Basic Inc. v. Levinson*, 485 U.S. 224

17  (1988).

18         Under *Dura*, **one way** to demonstrate loss causation is to show that the "relevant

19  truth" about the "financial condition of a corporation" previously misrepresented or

20  concealed became "generally known" and corrected the stock price.  544 U.S. at 342-44.

---

22  [7]     For a §10(b) claim, plaintiffs need only demonstrate that defendants'
23  misrepresentations or omissions were a **substantial** factor in the stock's price decline.  *In re*
    *Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("'As long as the misrepresentation is [a]
24  substantial cause of the investment's decline in value, other contributing forces will not bar
    recovery under the loss causation requirement'"); *Miller v. Asensio & Co.*, 364 F.3d 223,
25  229, 232 (4th Cir. 2004) (loss causation requires "only that the plaintiff show that the
    defendant's conduct was a substantial cause of its injury") (emphasis in original).   In
26  contrast, to meet their heavy negative-causation burden under §11, defendants must prove
    that the decline in Syntax-Brillian's stock price "resulted '**solely**' from factors other than the
27  material omissions" or misstatements.  *Collins*, 605 F.2d at 115-16; *Flowserve*, 572 F.3d at
    234.

1    This proof can be established by demonstrating that the financial results revealed were

2    "related" to the subject matter of the misrepresentations alleged.  As *Basic* emphasized,

3    "There is [] **more than one way** to demonstrate the causal connection . . . between the

4    plaintiffs' injury and the defendant's wrongful conduct."  485 U.S. at 243.  Certainly, when

5    corrective disclosures identify defendants' wrongful conduct directly, that is the easiest way

6    to establish loss causation.  But defendants are seldom so forthcoming.  Defendants' theory

7    allows them to immunize themselves simply by delaying, misdirecting or outright continuing

8    to falsify the reasons for the Company's negative results that they can no longer conceal.

9        In *Daou*, the Ninth Circuit explicitly rejected the concept that there must be a public

10   disclosure that defendants were "engaged in improper accounting **practices**" in order to

11   demonstrate loss causation.  411 F.3d at 1026.  Reversing a district court that had required

12   such an explicit admission by defendants, the Ninth Circuit held that a plaintiff satisfies

13   *Dura* by demonstrating that "the price of [defendant company's] stock fell precipitously after

14   defendants began to reveal figures showing the company's **true financial condition**."  *Id.*

15   Since *Daou*, the Ninth Circuit has repeatedly reaffirmed that loss to investors can be caused

16   when the **impact** of defendants' wrongdoing on the company's true financial condition is

17   revealed – even if the specific **practices** defendants used to accomplish their wrongdoing

18   remain concealed.  *Komie v. Saxton*, No. 07-15764, 2008 U.S. App. LEXIS 10585, at *2 (9th

19   Cir. May 12, 2008) (**public revelation** of '"true financial condition"' combined with

20   **complaint allegations** linking that condition to fraud are necessary to plead loss causation);

21   *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008); *In re Gilead Scis.*

22   *Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008).

23       In *Berson*, as in *Daou*, the Ninth Circuit upheld a theory of loss causation alleging that

24   defendants' wrongdoing was revealed to the market through disclosure of the company's true

25   financial condition – not revelation of defendants' improper practices: "The **complaint**

26   describes the stop-work orders in detail, explains that the orders halted a significant amount

27   of work, alleges that the reduced workload caused revenue to fall by 25%, and claims that

28   **this revenue reduction** caused the stock price to drop by 16%."  527 F.3d at 989.  Thus, the

1   only public disclosure causing loss was the ***impact*** of the fraud – the 25% revenue reduction.

2   *Id.* at 984.   The court did not require public disclosure of defendants' ***practices*** – *i.e.*,

3   concealing both the stop-work orders and the details of the reduced workload – most of

4   which defendants continued to conceal.  Moreover, beyond not requiring a public ***disclosure***

5   of the practices, *Berson* acknowledged that plaintiffs had not even ***alleged*** "precisely which

6   parts of which contracts three of the stop-work orders [were] affected." *Id.* at 989.  Instead,

7   the court recognized that loss was caused when defendants disclosed the ***impact*** of the (still

8   concealed) stop-work orders on the company's revenues – its true financial condition.  *Id.* at

9   989-90.  *Gilead*, following *Daou*, *Komie*, and *Berson*, further confirms this distinction.  Even

10  where defendants' fraudulent practices ***were*** publicly revealed, the Ninth Circuit recognized

11  that loss was not caused until the company disclosed the ***impact*** of the improper practices on

12  its true financial condition.  *Gilead*, 536 F.3d at 1053-54.  Indeed, several circuits have

13  recently rejected such "mirror-image" tests as both legally incorrect and unduly onerous.

14  The Fifth Circuit (with Justice O'Connor sitting) held that "[i]f a fact-for-fact disclosure

15  were required to establish loss causation, a defendant could defeat liability by refusing to

16  admit the falsity of its prior misstatements." *Flowserve*, 572 F.3d at 230.  The Tenth Circuit

17  held that "[t]o be corrective, the disclosure need not precisely mirror the earlier

18  misrepresentation." *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1140 (10th

19  Cir. 2009).  Thus, defendants' loss causation theory does not comport with applicable

20  authority on loss causation standards.[8]

21

22

------

23  [8]      The decision in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th
    Cir. 2008) represents a deviation from the loss causation standards established by the weight
24  of Ninth Circuit authority reflected by *Daou*, *Berson*, *Gilead* and *Komie*.  The district court
    decision cited by defendants – *In re Shoretel Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009
25  U.S. Dist. LEXIS 11151 (N.D. Cal. Feb. 2, 2009) – was followed by *In re Shoretel Inc. Sec.
    Litig.*, No. C 08-00271 CRB, 2009 U.S. Dist. LEXIS 73316 (N.D. Cal. Aug. 19, 2009).  In
26  the latter decision, the court held that although "the press release says nothing" about the
    alleged misrepresentations, "[i]t is not impossible that the market understood the press
27  release to have revealed previously undisclosed facts about misstatements in the Registration
    Statement."  *Id.* at *10-*12.

28

### 2. The Losses Suffered by Plaintiffs and the Class Are Related to Defendants' Misrepresentations in the SPO

Courts have held that even if a defendant meets its burden under Rule 56, "the plaintiff may survive a summary judgment motion by coming forward with evidence suggesting that the price decline resulted from the alleged misstatement." *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 18701, at *6 (S.D.N.Y. Aug. 30, 2005). Plaintiffs have done so here. Plaintiffs have submitted evidence based upon expert opinion that "[t]he market discerned the previously concealed information and learned about the true operating and financial conditions of the Company via disclosures made on 12 September 2007 and 14 November 2007."[9] Plaintiffs' expert explains that "[b]y causing analysts and investors to overestimate cash flow from sales and accounts receivables, the alleged misrepresentations and omissions concealed from analysts and investors that the Company had a cash flow problem that threatened its growth and viability." Feinstein Report at 21. Plaintiffs' expert also opined that "[t]he price of Syntax-Brillian stock was artificially inflated by at least $2.43 per share during the Class Period on account of the alleged misrepresentations and omissions." *Id.* at 42; *see also Id.* at 4, 17-19, 30-35; Plaintiffs' Separate Statement, Undisputed Item No. 5. Additionally, "[i]n response to partially corrective disclosures through which the market learned of errors and alleged irregularities in the Company's accounting and gained a better understanding of the true condition of the Company's operating and financial conditions, the inflation dissipated and the stock price fell." Feinstein Report at 4. "Numerous investors are similarly situated in that they purchased Syntax-Brillian stock during the Class Period and suffered losses that were caused by the alleged misrepresentations and omissions." *Id.* at 42.

---

[9]     *See* Expert Report of Steven P. Feinstein, Ph.D., CFA ("Feinstein Report") at 4, contained within the Declaration of Steven P. Feinstein, Ph.D., CFA in Support of Plaintiffs' Opposition to Defendants Sollitto and Pratt's Motion for Summary Judgment ("Feinstein Decl."), Ex. A; Plaintiffs' Separate Statement, Undisputed Item No. 4.

As a result, "the court simply cannot conclude as a matter of law that the plaintiffs' losses 'resulted from factors other than the material misstatement in the registration statement.'" *In re Adams Golf, Inc.*, 618 F. Supp. 2d 343, 347-48 (D. Del. 2009); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 560 (N.D. Ill. 2007).   Because plaintiffs have come forward with evidence demonstrating that the losses suffered by plaintiffs and the class were related to the misrepresentations in the Offering Documents, a triable issue of fact exists and the Court must deny defendants' Motion.[10]

## C.   A Genuine Issue of Fact Exists for Plaintiffs' Control Person Claims Against Defendants

To prove control person liability, a plaintiff must prove: (i) a primary violation of federal securities law; and (ii) defendant's power or control over the primary violator. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).   Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. §230.405; *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 788 (C.D. Cal. 2004).   The Ninth Circuit has declared that "[w]hether a defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard*, 228 F.3d at 1065.   A plaintiff "need not show a controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).   Once the plaintiff establishes that a defendant is a controlling person, the defendant then bears a burden of proving that he or she acted in good faith. *Id.*   Given the positions held by CEO Sollitto and CFO Pratt and their inability to demonstrate good faith, their involvement "with the day-to-

---

[10]      Defendants contend that the Company's resignation announcements are irrelevant. Motion at 12 n.6.   Such is not the case.   Feinstein Report at 32-35; *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863 DOC (RNBx), 2008 U.S. Dist. LEXIS 68419, at *24-*25 (C.D. Cal. July 10, 2008); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007).

1 | day operations and the financial aspects of [the Company] supports an inference sufficient to

2 | withstand a motion for summary judgment." *Homestore*, 347 F. Supp. 2d at 790.

3 | **V.      CONCLUSION**

4 |        For the foregoing reasons, the Court should deny defendants' Motion.

5 | DATED: October 8. 2009                      Respectfully submitted,

6 |                                             COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
7 |                                             EX KANO S. SAMS II

8 |

9 |                                                    s/ Ex Kano S. Sams II
                                             EX KANO S. SAMS II
10 |

11 |                                            9601 Wilshire Blvd., Suite 510
                                             Los Angeles, CA  90210
12 |                                            Telephone:  310/859-3100
                                             310/278-2148 (fax)
13 |                                            COUGHLIN STOIA GELLER
                                                  RUDMAN & ROBBINS LLP
14 |                                            G. PAUL HOWES
                                             DEBRA J. WYMAN
15 |                                            DANIEL S. DROSMAN
                                             SCOTT H. SAHAM
16 |                                            SAMANTHA A. SMITH
                                             SHANNON M. MATERA
17 |                                            JENNIFER Y. LAI
                                             655 West Broadway, Suite 1900
18 |                                            San Diego, CA  92101
                                             Telephone:  619/231-1058
19 |                                            619/231-7423 (fax)
20 |                                            Lead Counsel for Plaintiffs
21 |                                            BUCKLEY KING
                                             MICHAEL SALCIDO
22 |                                            2020 North Central Avenue, Suite 1120
                                             Phoenix, AZ  85004
23 |                                            Telephone:  602/424-2550
                                             602/424-2566 (fax)
24 |                                            Liaison Counsel
25 |

26 |

27 |

28 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VANOVERBEKE MICHAUD
 & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiffs

S:\CasesSD\Syntax-Brillian\BRF00061927 S&P Oppo.doc

1

<u>CERTIFICATE OF SERVICE</u>

2

 I hereby certify that on October 8. 2009, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify

5

that I have mailed the foregoing document or paper via the United States Postal Service to

6

the non-CM/ECF participants indicated on the attached Manual Notice List.

7

 I certify under penalty of perjury under the laws of the United States of America that

8

the foregoing is true and correct.  Executed on October 8. 2009.

9

10

        s/ EX KANO S. SAMS II
        EX KANO S. SAMS II

11

        COUGHLIN STOIA GELLER

12

         RUDMAN & ROBBINS LLP
        9601 Wilshire Blvd., Suite 510

13

        Los Angeles, CA  90210
        Telephone:  310/859-3100

14

        310/278-2148 (fax)

15

        E-mail:  exkanos@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 2:07-cv-02204-FJM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Bruce A Abbott**
  Bruce.Abbott@mto.com,Valentina.Neufeld@mto.com

- **Joseph G Adams**
  jgadams@swlaw.com,mgarsha@swlaw.com,docket@swlaw.com

- **Shaunt T Arevian**
  sarevian@irell.com

- **Jonathan E Behar**
  jbehar@csgrr.com,jbehar@csgrr.com,aromero@csgrr.com

- **James J Belanger**
  jbelanger@csblaw.com,ejames@csblaw.com

- **Maureen Beyers**
  mbeyers@omlaw.com,lsmock@omlaw.com,ecfdc@omlaw.com

- **Avi Braz**
  avi.braz@mto.com

- **Gustavo Fabian Bruckner**
  bruckner@whafh.com

- **H Michael Clyde**
  MClyde@perkinscoie.com,docketphx@perkinscoie.com,lsandoval@perkinscoie.com

- **Sean K Collins**
  scollins@csgrr.com,scollins@csgrr.com,keagen@csgrr.com

- **Efren A Compean**
  ecompean@garrett-tully.com

- **Christopher Robert Cowan**
  ccowan@irell.com

- **Michelle Craven**
  mcraven@gibsondunn.com

- **Jonathan Cobb Dickey**
  jdickey@gibsondunn.com

- **Daniel S Drosman**

ddrosman@csgrr.com,tholindrake@csgrr.com

- **Douglas H Fitch**
  dfitch@jbhhlaw.com,mterry@jbhhlaw.com

- **Andrew S Friedman**
  afriedman@bffb.com,rcreech@bffb.com,ngerminaro@bffb.com

- **Francis M Gregorek**
  gregorek@whafh.com

- **Susan L Hoffman**
  susan.hoffman@bingham.com,gloria.moonesinghe@bingham.com

- **Joel Philip Hoxie**
  jhoxie@swlaw.com,jkfisher@swlaw.com,docket@swlaw.com

- **Mark P Hummels**
  mhummels@omlaw.com,bwendt@omlaw.com,ecfdc@omlaw.com

- **Jennifer Y Lai**
  jlai@csgrr.com

- **James Raza Lawrence**
  Raza.Lawrence@mto.com,Sharon.Nial@mto.com

- **Rebecca Justice Lazarus**
  rjustice@gibsondunn.com,rmcbain@gibsondunn.com

- **Daniel P Lefler**
  dlefler@irell.com

- **Frank Lewis**
  franklewis@aol.com

- **John L Lin**
  jlin@garrett-tully.com

- **Jennifer Lopez**
  jennifer.lopez@bingham.com

- **Robert A Mandel**
  mandelr@gtlaw.com,coles@gtlaw.com

- **Shannon McKenna Matera**
  smatera@csgrr.com,Hkharadjian@csgrr.com,Rduenez@csgrr.com

- **Kevin Michael McGee**
  kmcgee@zsz.com

- **Gregory Mark Nespole**
  nespole@whafh.com

- **John David Pernick**
  john.pernick@bingham.com,frank.downing@bingham.com

- **Patricia Lee Refo**
  prefo@swlaw.com,jaltendorf@swlaw.com,docket@swlaw.com

- **Darren J Robbins**
  darrenr@csgrr.com,E_File_SD@csgrr.com

- **Hart Lawrence Robinovitch**
  hlr@zimmreed.com,sab@zimmreed.com,az.clerk@zimmreed.com

- **David B Rosenbaum**
  drosenbaum@omlaw.com,kdourlein@omlaw.com,ecfdc@omlaw.com

- **Michael Salcido**
  salcido@buckleyking.com,kennelly@buckleyking.com

- **Ex Kano S Sams , II**
  exkanos@csgrr.com,exkanos@csgrr.com

- **Brian Jay Schulman**
  schulmanb@gtlaw.com,fischerc@gtlaw.com

- **Robert F Serio**
  rserio@gibsondunn.com

- **Rebecca K Setlow**
  RSetlow@perkinscoie.com,docketphx@perkinscoie.com,rweidner@perkinscoie.com

- **Charlene S Shimada**
  charlene.shimada@bingham.com,frank.downing@bingham.com

- **Laura Elizabeth Sixkiller**
  sixkillerl@gtlaw.com,hinkell@gtlaw.com

- **Samantha A Smith**
  ssmith@csgrr.com

- **Richard A Speirs**
  rspeirs@zsz.com,dlanier@zsz.com

- **Lee Squitieri**
  lee@sfclasslaw.com

- **Stephen J Tully**
  stully@garrett-tully.com

- **Craig Varnen**
  cvarnen@irell.com

- **Frank Verderame**
  fverderame@plattner-verderame.com,edegrave@plattner-verderame.com

- **E Jeffrey Walsh**
  walshj@gtlaw.com,bergerp@gtlaw.com

- **Lillie A Werner**
  lwerner@irell.com

- **Debra J Wyman**
  debraw@csgrr.com

- **Joseph J Ybarra**
  joseph.ybarra@mto.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)