1  BUCKLEY KING
   MICHAEL SALCIDO
2  2020 North Central Avenue, Suite 1120
   Phoenix, AZ  85004
3  Telephone:  602/424-2550
   602/424-2566 (fax)
4  salcido@buckleyking.com

5  Liaison Counsel

6  COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
7  G. PAUL HOWES
   SCOTT H. SAHAM
8  DEBRA J. WYMAN
   DANIEL S. DROSMAN
9  SAMANTHA A. SMITH
   SHANNON M. MATERA
10 JENNIFER Y. LAI
   655 West Broadway, Suite 1900
11 San Diego, CA  92101
   Telephone:  619/231-1058
12 619/231-7423 (fax)                          COUGHLIN STOIA GELLER
   paulh@csgrr.com                                 RUDMAN & ROBBINS LLP
13 scotts@csgrr.com                             EX KANO S. SAMS II
   debraw@csgrr.com                             9601 Wilshire Blvd., Suite 510
14 dand@csgrr.com                               Los Angeles, CA  90210
   ssmith@csgrr.com                             Telephone:  310/859-3100
15 smatera@csgrr.com                            310/278-2148 (fax)
   jlai@csgrr.com                               exkanos@csgrr.com
16
   Lead Counsel for Plaintiffs
17
   [Additional counsel appear on signature page.]
18
                   UNITED STATES DISTRICT COURT
19
                        DISTRICT OF ARIZONA
20
   TEIMURAZ TSIREKIDZE, On Behalf of  )   No. 2:07-cv-02204-FJM
21 Himself and All Others Similarly Situated, )   **(Consolidated)**
                                       )
22                     Plaintiff,      )   CLASS ACTION
                                       )   _____
23       vs.                           )   PLAINTIFFS' OPPOSITION TO
                                       )   DEFENDANTS JAMES CHING HUA LI
24 SYNTAX-BRILLIAN CORP., et al.,      )   AND MAN KIT (THOMAS) CHOW'S
                                       )   MEMORANDUM OF POINTS AND
25                     Defendants.     )   AUTHORITIES IN SUPPORT OF
   _____ )   MOTION FOR SUMMARY JUDGMENT
26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 2

III. STANDARD FOR SUMMARY JUDGMENT ..................................................... 8

IV.  ARGUMENT ...................................................................................................... 9

    A.   A Genuine Issue of Fact Exists for Plaintiffs' §11 Claims Against
        Defendants ................................................................................................. 9

    B.   A Genuine Issue of Fact Exists Regarding Whether Defendants'
        Misrepresentations in the SPO Caused Losses to Plaintiffs and the
        Class ....................................................................................................... 11

        1.   Courts Have Rejected Defendants' Loss Causation Theory
            that Corrective Disclosures Must Mirror the
            Misrepresentations Alleged Fact for Fact ......................................... 12

        2.   The Losses Suffered by Plaintiffs and the Class Are Related
            to Defendants' Misrepresentations in the SPO ................................ 14

    C.   A Genuine Issue of Fact Exists for Plaintiffs' Claims Under §12 of
        the Securities Act and §10(b) of the Exchange Act ................................... 15

    D.   A Genuine Issue of Fact Exists for Plaintiffs' Control Person Claims
        Against Defendants .................................................................................. 17

V.   CONCLUSION ................................................................................................. 17

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Adair v. Kaye Kotts Assocs.*,
No. 97 Civ. 3375 (SS), 1998 U.S. Dist. LEXIS 3900
(S.D.N.Y. Mar. 27, 1998) ........................................................................ 9

*Akerman v. Oryx Commc'ns, Inc.*,
810 F.2d 336 (2d Cir. 1987) ................................................................... 11

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ......................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................. 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ............................................................................... 12

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ........................................................... 13, 14

*Casella v. Webb*,
883 F.2d 805 (9th Cir. 1989) ........................................................... 15, 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................. 9

*Collins v. Signetics Corp.*,
605 F.2d 110 (3d Cir. 1979) ............................................................. 11, 12

*Consol. Elec. Co. v. U.S.*,
355 F.2d 437 (9th Cir. 1966) ................................................................... 9

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................... 12, 13, 16

*Escott v. BarChris Construction Corp.*,
283 F. Supp. 643 (S.D.N.Y. 1968) ......................................................... 11

*Feit v. Leasco Data Processing Equip. Corp.*,
332 F. Supp. 544 (E.D.N.Y. 1971) ......................................................... 11

*Fox v. Citicorp Credit Servs.*,
15 F.3d 1507 (9th Cir. 1994) ................................................................... 9

*Giles v. GMAC*,
494 F.3d 865 (9th Cir. 2007) ................................................................... 9

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ............................................................................ 9, 10

**Page**

*Howard v. Everex Sys.,*
        228 F.3d 1057 (9th Cir. 2000) .......................................................... 17

*In re Adams Golf, Inc.,*
        618 F. Supp. 2d 343 (D. Del. 2009) ................................................. 15

*In re Daou Sys.,*
        411 F.3d 1006 (9th Cir. 2005) .................................................. *passim*

*In re Gilead Scis. Sec. Litig.,*
        536 F.3d 1049 (9th Cir. 2008) ................................................. 13, 14

*In re Homestore.com, Inc. Sec. Litig.,*
        347 F. Supp. 2d 769 (C.D. Cal. 2004) ............................................. 17

*In re Motorola Sec. Litig.,*
        505 F. Supp. 2d 501 (N.D. Ill. 2007) .............................................. 15

*In re Shoretel Inc. Sec. Litig.,*
        No. C 08-00271 CRB, 2009 U.S. Dist. LEXIS 11151
        (N.D. Cal. Feb. 2, 2009) ................................................................. 14

*In re Williams Sec. Litig.,*
        558 F.3d 1130, 1140 (10th Cir. 2009) ............................................ 14

*In re WRT Energy Sec. Litig.,*
        No. 96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 18701
        (S.D.N.Y. Aug. 30, 2005) .............................................................. 14

*Komie v. Saxton,*
        277 Fed. Appx. 750 (9th Cir. 2008) ......................................... 13, 14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.,*
        540 F.3d 1049 (9th Cir. 2008) ........................................................ 14

*Miller v. Asensio & Co.,*
        364 F.3d 223 (4th Cir. 2004) .......................................................... 12

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,*
        96 F.3d 1151 (9th Cir. 1996) .......................................................... 17

*Stuart v. Radioshack Corp.,*
        No. C-07-4499 EMC, 2009 U.S. Dist. LEXIS 84804
        (N.D. Cal. Aug. 28, 2009) ................................................................ 9

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
        §77k(a) ............................................................................................. 9
        §77k(e) .................................................................................... *passim*
        §77l ............................................................................................ 15, 16
        §77l(a)(2) ........................................................................................ 15

**Page**

§78i(b) .............................................................................................. 1. 12, 15, 16
§78t(a) ........................................................................................................... 1

Federal Rules of Civil Procedure
Rule 56 ......................................................................................................... 14
Rule 56(c) ...................................................................................................... 9

17 C.F.R.
§230.405 ....................................................................................................... 17

1    Lead Plaintiff City of St. Clair Shores Police and Fire Retirement System and Named

2    Plaintiff City of New Haven Policemen's and Firemen's Pension Fund ("New Haven")

3    (collectively "plaintiffs") hereby oppose Defendants James Ching Hua Li and Man Kit

4    (Thomas) Chow's Memorandum of Points and Authorities in Support of Motion for

5    Summary Judgment ("Motion"), Doc. 325-1.[1]

6    **I.    INTRODUCTION**

7    Former President, Chief Operating Officer ("COO") and director of Syntax-Brillian

8    Corporation ("Syntax-Brillian" or the "Company") James Ching Hua Li ("Li") and former

9    Chief Procurement Officer and director Man Kit (Thomas) Chow ("Chow") (collectively

10   "defendants") ask the Court to dismiss as a matter of law the claims brought against them

11   under §§11, 12 and 15 of the Securities Act of 1933 ("Securities Act") and §§10(b) and 20(a)

12   of the Securities Exchange Act ("Exchange Act").  Defendants raise only two grounds to

13   support their Motion: the affirmative defense of negative causation for the Securities Act

14   claims and loss causation for the Exchange Act claims.

15   Defendants have failed to satisfy their heavy burden.  Through this opposition,

16   plaintiffs have submitted substantial evidence demonstrating that genuine issues of material

17   fact exist regarding defendants' liability and that the alleged misrepresentations caused the

18   losses suffered by plaintiffs and the class.  Indeed, plaintiffs have submitted the opinions of

19   two experts who have opined that defendants failed to exercise reasonable care in conducting

20   due diligence regarding the Company's May 24, 2007 secondary public offering ("SPO")

21   and that Syntax-Brillian's stock price declines after the Company's September 12, 2007 and

22   November 14, 2007 disclosures were related to the alleged misrepresentations and

23   omissions.  Plaintiffs have also come forward with evidence demonstrating that genuine

24   issues of material fact exist for plaintiffs' Exchange Act claims.  Accordingly, the Court

25   must deny defendants' Motion.

26   _____

27   [1]    All "Doc." references are to entries on the Court's Electronic Case Filing system.

28

## II.    STATEMENT OF FACTS

This is an extremely strong case of securities fraud.  Syntax-Brillian manufactured high definition televisions under the brand name Olevia.  In Asia, Syntax-Brillian sold its televisions through the South China House of Technology ("SCHOT") and Olevia Far East ("OFE").  Taiwan Kolin Ltd. ("Kolin") – a related party of Syntax-Brillian – served as the principal contract manufacturer of Syntax-Brillian's televisions.

Syntax-Brillian committed fraud by devising several accounting schemes that directly led to the Company's collapse and bankruptcy.  For example, Syntax-Brillian prematurely recognized revenue on transactions with SCHOT in violation of Generally Accepted Accounting Principles ("GAAP").  Syntax-Brillian's purported sales to SCHOT constituted as much as 40% to 50% of the Company's total sales volume in some periods.  ¶76.[2]  In connection with the Company's bankruptcy proceedings, James Feltman ("Feltman"), an independent bankruptcy examiner, presented the conclusions of an investigation that he and his team conducted of Syntax-Brillian.  Feltman found that "[a]t the time that Syntax-Brillian was invoicing SCHOT and Olevia Far East, it was purporting to sell televisions which didn't exist because a completed 65-inch television weighs 235 pounds and the packages that were being sent from Kolin weighed a fraction of that."[3]  Indeed, Syntax-Brillian's shipments to SCHOT amounted to nothing more than consignments sales in Asia that allowed the Company to improperly recognize revenue.  ¶¶76-86.  Feltman concluded:

> These types of document[s], Your Honor also raise questions to me about the integrity and motivation of certain of the corporate officers and certain of the Syntax-Brillian's trading partners which I previously described suppliers and vendors because they must have known at the time that the documents that they were trading were not complete, did not represent finished goods and did not represent , at least at that time, a genuine economic obligation to perform under those documents.

---

[2]     Unless otherwise specified, all paragraph ("¶") references are to the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("CC"), Doc. 96.

[3]     Proposed Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("CAC"), ¶¶4, 211-21, Doc. 205.

1    CAC, ¶5.  John Orenstein ("Orenstein"), the Company's appointed examiner who also

2    conducted an examination of Syntax-Brillian's accounting, confirmed the same conclusions

3    and stated "[when] you put all this together and you really are struck by the notion that there

4    was something very wrong with the booking of sales and receivables in the case of [SCHOT]

5    and OFE."  CAC, ¶6.

6          The Company also engaged in fraud by creating false accounting entries called

7    "tooling deposits" that were purportedly payments to Kolin for the creation of molds to

8    manufacture television frames.  However, Gregory Rayburn ("Rayburn"), the Company's

9    CEO after the February 9, 2007 through November 14, 2007 class period ("Class Period"),

10   testified during a bankruptcy proceeding that the "tooling deposits" were not "tooling

11   deposits" and that Kolin was not a manufacturer of television molds.  CAC, ¶3.  Rayburn

12   stated the notion that millions and millions went for tooling is wrong – it just went.  *Id.*  In

13   further testimony, Rayburn added that the "account entry called tooling deposits is – were

14   invoices that were for – were labeled various and those payments were directly to Kolin.  So

15   they don't represent tooling deposits . . . it had nothing to do with the molds."  *Id.*  Syntax-

16   Brillian created these fictitious "tooling deposits" and improperly recognized revenue on

17   transactions with SCHOT to enable the Company to artificially inflate its revenues, profit

18   margins and earnings per share during the Class Period and to raise more than $143 million

19   through its May 24, 2007 SPO that incorporated the Company's false financial statements.

20   ¶¶2, 87-96; CAC, ¶¶222-27.

21         Demonstrating the severity of Syntax-Brillian's fraudulent accounting practices, the

22   Department of Justice, the Internal Revenue Service and the Postal Inspection Service

23   created a fraud task force specially designed to investigate the Company's funneling of $140

24   million to Kolin and the falsification of its financial reports.  Declaration of Ex Kano S.

25   Sams II in Support of Plaintiffs' Opposition to Defendants James Ching Hua Li and Man Kit

26   (Thomas) Chow's Memorandum of Points and Authorities in Support of Motion for

27   Summary Judgment ("Sams Decl."), Exhibit ("Ex.") 1.  Kolin, moreover, was delisted from

28   the Taiwan Stock Exchange and Taiwanese prosecutors raided its office because of

accounting discrepancies between Kolin and Syntax-Brillian. *Id.* Additionally, the Securities and Exchange Commission ("SEC") sent Syntax-Brillian a letter of inquiry, focused upon the "various financial and accounting issues beginning July 1, 2005, including the accounting treatment of tooling deposits, cash advances to Asian manufacturers, outstanding accounts receivable, inventory returns, internal control issues, and [the Company's] supply chain relationships in Asia." ¶14. Indeed, during a bankruptcy proceeding, Syntax-Brillian's own attorney admitted "I think we were very candid with the Court that we thought there was a possibility of fraud from the beginning." CAC, ¶226.

Overwhelming evidence demonstrates defendants' wrongdoing. For example, demonstrating that the transactions between Syntax-Brillian and Kolin were not arms-length transactions, in an e-mail dated August 7, 2005 from Robert Chiu ("Chiu"), a partner of Asian Practice at Grobstein, Horwath & Company LLP ("Grobstein"), to COO Li, Chief Procurement Officer Chow and Roger Kao ("Kao"), Vice President ("VP") of Kolin, Chiu wrote: "I know Kolin and Syntax are very closed [sic] and so do all of you. But to really show a separate and independent relationship, Syntax got [sic] to show that it is not an 'agent' of Kolin in the US. . . . You need to show a clean cut of the relationship now and going forward." AOB010386, Sams Decl., Ex. 2. In an August 11, 2005 e-mail from Chiu to Li, Chow and Alice Phang ("Phang"), the Company's Controller, Chiu wrote:

> I was told my [sic] James and Thomas that the option to acquire the additional interest was still in the drawing board and was jsut [sic] talk and discussion. ***That better be true [. . .] or you are going to open a can of worms as now everyone will be asking for more information about Digimedia, including [NASDAQ] and the SEC [. . . .] How come we were not informed about such back dating of the option to March 2004? Then that means the June 2004 audited statements are wrong for not disclosing this agreement.***

AOB004948-51 at 48, Sams Decl., Ex. 3.[4]

Similarly, in a September 26, 2005 e-mail from Chiu to Li and Chow, Chiu wrote:

> ***We all know that "revenue recognition" is and has been a HOT topic in the eyes of the SEC. In their eyes on this area, there is no grey area.***

---

[4] Unless otherwise indicated, all emphasis is added and citations are omitted.

*They will not accept any act or questionable act from the management to manipulate the revenue to either direction.*

*On the sales made to BDI [Laguna] on June 30, 2005, after reviewing all of the facts and data from your office (including the letter from BDI), it will be hard press[ed] to argue that throughout all year, both companies have been operating on a FOB destination but not on those sales made on the last day of the fiscal year.*

*You can argue all day if you want to that both parties had made the SAME mistakes on the purchase order and sales invoice. But I can tell you that upon a full review by the SEC, your argument will not pass the "smell test".*

Second issue is on the provision on the price protection on sales made to major customers like Target and CompUSA in the month of April through June.

\*        \*        \*

*We all can see that all along you have been issuing price protection to your customers. So now at the end of the fiscal year end audit, you are now telling us that there would be NO price protection to be issued for the sales made in April, May and June just will not passed [sic] the "smell test" again in the eyes of SEC. To them it is just another act by the management to manipulate the revenue or net profit or loss.*

AOB010433-35 at 33-34, Sams Decl., Ex. 4. Li responded to Chiu and copied Chow, former Chief Financial Officer ("CFO"), Vice President, Secretary and Treasurer Wayne A. Pratt ("Pratt") and others and stated that he fully agreed with Chiu's description of the issues related to the Company's fraudulent accounting practices. *Id.*

In an e-mail dated December 9, 2005 from Chiu to Kolin VP Kao and COO Li with a subject line that read "We need to have a serious talk on Sunday," Chiu wrote:

Two subjects we must talk [about] on Sunday.

1. Changes needed to be made immediately on current Syntax accounting department and procedures.

*2. Price protection and other marketing support from Kolin on a monthly basis – because of the timing that Kolin's price protection comes into Syntax there is an inherent time lag that will probably make gross profit margins fluctuate from quarter to quarter. For example, when we do the LCM (lower of cost or market) analysis on quarter end numbers and find out there is a large markdown that needs to be booked, it will lower the gross profit and net income numbers for that quarter.*

*You probably do not know this markdown will be required when you dissusses [sic] price protection with Kolin you will not be able to get the*

*proper amount of price protection in the quarter that the price protection is needed.*

AOB010502, Sams Decl., Ex. 5.

Other documents further confirm plaintiffs' allegations.  In an e-mail dated February 10, 2006, Grobstein partner Chiu wrote to Controller Phang, Chief Procurement Officer Chow and CFO Pratt and said "South China's A/R is getting way too much on the 90+ [days delinquent].  We will need much more than 'confidence' as far as collectability." AOB010539, Sams Decl., Ex. 6.  In an e-mail dated July 6, 2006 from Chiu to Phang, Chow, and COO Li, Chiu wrote "[s]omeone needs to explain to us why Syntax is going back to selling to South China again.  We were told back in January 2006 that due to the custom issue, sales to South China caused excess delay in A/R collection and the company had decided to stop the distributor relationship."  AOB010632-34 at 32, Sams. Decl., Ex. 7. Additionally, in a report dated June 30, 2006 entitled "Syntax-Brillian Corporation: Significant Deficiencies Noted in Connection with Financial Statement Audit," Syntax-Brillian's management and audit committee were informed about significant internal control deficiencies.  EY 0004221-30 at 21, Sams Decl., Ex. 8.

In an e-mail dated July 27, 2006 from Trevor Sheetz, Vice President of Sales, to COO Li, Chief Procurement Officer Chow and others and copied to CFO Pratt and former Chief Executive Officer ("CEO") and Board Chairman Vincent F. Sollitto, Jr. ("Sollitto"), Sheetz wrote "why do you keep increasing these projection numbers every week?  Can't we find a realistic stable projection and stick with it?  Its [sic] making everyone shake their heads here wondering what you're up to and committing us too that may put us in a bad light with the market with over estimations.  As you know my projection does not meet up with yours." SBC-0096340-43 at 42, Sams Decl., Ex. 9.

Additionally, in an e-mail chain dated October 11, 2006, CFO Pratt forwarded to COO Li and CEO Sollitto a previous e-mail from Controller Phang that included revised revenue numbers.  Pratt stated to Li and Sollitto "[t]here was approx. $4.9 million of product that shipped in the last week of the quarter that didn't make cut-off."  SBC-29131-33 at 31,

Sams Decl., Ex. 10.  Li responded to Pratt and Sollitto in an e-mail marked high importance stating "***[b]y the way, in order to make our EPS [earnings per share] at around 0.03 level, we should reserve 'less' on the 'sales reserve' item, agree? We can always reserve more within the Dec. quarter FS.***"  *Id.*

Other internal documents further illustrate the Company's fraud.  In an e-mail chain dated October 16-17, 2006 marked high importance with a subject line reading "RE: Preliminary FS ended 9/06," Syntax-Brillian management discussed the use of price protection to meet its gross margins as forecasted.  SBC-29087-92 at 87, Sams Decl., Ex. 11.  Phang, Chow, and Li discussed providing Pratt with a price protection ("PP") amount and Li suggested that he prefers "to go with $3.5 even [if] it means a lot of net margin for us but it will be safe."  *Id.* at SBC-29089-90.  Li explained "[i]t's OK, we could always tell him [Pratt] that we have total of $3.5M PP from Kolin in our pocket to be used if it is necessary. (I think we may need it anyway.)[.]"  *Id.* at SBC-29087.  In e-mail chains in October 2006, CEO Sollitto, CFO Pratt, COO Li, Chief Procurement Officer Chow, Controller Phang and Kolin VP Kao discussed booking fictitious "tooling deposits" on the Company's books. SBC-29059-60, Sams Decl., Ex. 12; SBC-29064-65, Sams Decl., Ex. 13; SBC-29066-67, Sams Decl., Ex. 14; SBC-29069-74, Sams Decl., Ex. 15.

In an e-mail chain dated April 11, 2007 with a subject line entitled "SCHOT Receivables," CFO Pratt attempts to obtain answers to questions that he has for Stanley Chan, the CEO of SCHOT.  SBC-29124-28 at 24, Sams Decl., Ex. 16.  Unsatisfied with the responses he received, Pratt wrote the following to Li, Chow and Sollitto in response:

> I understand all of that.
>
> Please understand where I am at personally, I am the CFO of the company and, as such, people look to me for explanations on this.  ***The investors in BRLC [Syntax-Brillian] don't own any of SCHOT's shares. The investors in BRLC don't own any of Kolin's shares.  The only interest our investors have in our business in Asia is $164.5 million of accounts receivable from SCHOT.  Therefore, our investors will tend to hold us accountable (as they should) for collection of those receivables.  Our investors, understandably, are getting a little nervous about having such a large balance due from one company that they know nothing about.***  So they ask me questions.  If I have no info (committed payment dates, etc.) or if SCHOT is not willing to do something like allowing CIT (or another

1  borrower, or US for that matter), to have a security interest in their A/R, then I
2  have nothing to tell the investors when they ask (especially now that they are
   outside of terms).

3          Second point, the argument that the slow pay of SCHOT is not
   impacting our ability to provide product to our other customers is incorrect.  If
4  SCHOT paid us $41 million of cash today (amount that is past due from Nov.
   shipments), we would be able to pay this to Kolin, and Kolin would be able to
5  buy panels, correct?

6          When did Kolin buy 25% of SCHOT?  Per the attached, as of May
   2006, they didn't own any of SCHOT.
7
           James, I understand that Kolin has a lot at stake here too.  What I am
8  trying to do is make sure we can meet our obligations to our suppliers
   (INCLUDING Kolin) and our customers, and our shareholders.  We are on the
9  same page to try to raise the needed cash.  ***However, I am not willing to tell
   everybody this this A/R is OK when I don't have the ammo to support that
10 statement***.

11 *Id.*  Additionally, in an e-mail dated February 13, 2008 from Li to Hodgson and others , Li

12 confirmed that the Company's tooling deposits were fictitious accounting entries:

13          Jack:

14          Here is what Roger [Kao] has found in his file.  Due to the fact that this
   was signed long [sic] time ago (Nov. 2004); therefore, it took a while for
15 Roger to find it.  ***Also, since we never thought that the tooling charges is [sic]
   something that we are obligated to take care with from very [sic] beginning;
16 thus, this agreement were [sic] never presented and kept in our regular legal
   file after we merged with Brillian.***
17
   GHC 87930-37 at 30, Sams Decl., Ex. 17.  Sollitto and Pratt's testimony before the SEC also
18
   demonstrates the involvement of Li and Chow in the Company's fraudulent practices.  Sams
19
   Decl., Ex. 18 at 27-29, 32-36, 43-47, 60-71, 122-23, 161-79, 190-91, 202-04, 225-63; Ex. 19
20
   at 57, 62-67, 70-71, 84, 95, 97, 111, 114, 116-19, 127, 135-39, 151, 166-67, 184-85, 197-
21
   215, 245-51.  Additionally, Chow took advantage of his knowledge and material non-public
22
   information to sell 1,399,999 shares at $5.75 per share, for proceeds of over $8 million.
23
   ¶197.
24
25 **III.     STANDARD FOR SUMMARY JUDGMENT**

26         Summary judgment is a drastic remedy and should be rendered only "'if the

27 pleadings, depositions, answers to interrogatories, and admissions on file, together with the

28 affidavits, if any, show that there is no genuine issue as to any material fact and that the

1  moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477

2  U.S. 317, 322 (1986); *Consol. Elec. Co. v. U.S.*, 355 F.2d 437, 438 (9th Cir. 1966); Fed. R.

3  Civ. P. 56(c).  "Because '[c]redibility determinations, the weighing of the evidence, and the

4  drawing of legitimate inferences form the facts are jury functions, not those of a judge,'

5  '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be

6  drawn in his favor.'" *Giles v. GMAC*, 494 F.3d 865, 872 (9th Cir. 2007) (citing *Anderson v.

7  Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Additionally, because negative causation is

8  an affirmative defense under §§11 and 12, defendants bear the burden of proving beyond

9  peradventure all of the essential elements of the defense to warrant judgment in their favor.

10 *Fox v. Citicorp Credit Servs.*, 15 F.3d 1507, 1517 (9th Cir. 1994); *Stuart v. Radioshack

11 Corp.*, No. C-07-4499 EMC, 2009 U.S. Dist. LEXIS 84804, at *3 (N.D. Cal. Aug. 28, 2009);

12 *see also  Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 234 (5th Cir. 2009);

13 *Adair v. Kaye Kotts Assocs.*, No. 97 Civ. 3375 (SS), 1998 U.S. Dist. LEXIS 3900, at *24-*26

14 (S.D.N.Y. Mar. 27, 1998).

15 **IV.    ARGUMENT**

16     **A.    A Genuine Issue of Fact Exists for Plaintiffs' §11 Claims Against
   Defendants**

17

18     Section 11 imposes liability "[i]n case any part of the registration statement, when

19 such part became effective, contained an untrue statement of a material fact or omitted to

20 state a material fact required to be stated therein or necessary to make the statements therein

21 not misleading."  15 U.S.C. §77k(a).  "The section was designed to assure compliance with

22 the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability

23 on the parties who play a direct role in a registered offering."  *Herman & MacLean v.

24 Huddleston*, 459 U.S. 375, 381-82 (1983).  "If a plaintiff purchased a security issued

25 pursuant to a registration statement, he need only show a material misstatement or omission

26

27

28

1   to establish his prima facie case."  *Id.* at 382.[5]  "Once a plaintiff establishes a prima facie

2   case under the Securities Act, loss causation is presumed."  *Flowserve*, 572 F.3d at 234.

3   Significantly, scienter is not a requirement for liability under §11 and defendants will be

4   liable for innocent or negligent material misstatements or omissions.  *Herman*, 459 U.S. at

5   382.  Accordingly, §11 "places a relatively minimal burden on a plaintiff."  *Id.*

6          Substantial evidence demonstrates that defendants made material misstatements and

7   omissions in the Offering Documents and that defendants failed to exercise reasonable care

8   in conducting due diligence regarding the SPO.[6]  Defendants failed to meet the standard of

9   care and custom and practice for due diligence related to material disclosures applicable to

10  the SPO.  *Id.*; Separate Statement of Disputed and Undisputed Facts in Support of Plaintiffs'

11  Opposition to Defendants James Ching Hua Li and Man Kit (Thomas) Chow's

12  Memorandum of Points and Authorities in Support of Motion for Summary Judgment

13  ("Plaintiffs' Separate Statement"), Undisputed Item No. 1.  Defendants knew, or should have

14  known in the exercise of reasonable care, that the Offering Documents omitted, misstated

15  and inadequately disclosed information.  Puntillo Report at 8; Plaintiffs' Separate Statement,

16  Undisputed Item No. 2.  Moreover, the omitted, misstated and inadequately disclosed

17  information was of such a nature that a prudent investor would have placed substantial

18  importance on the information in reaching an investment decision.  Puntillo Report at 8;

19  Plaintiffs' Separate Statement, Undisputed Item No. 3.

20          Specifically, the evidence reveals that there is no record of a reasonable due diligence

21  investigation performed by defendants in connection with tooling and inventory deposits

22

23  [5]     The Court has previously determined that New Haven purchased securities pursuant
      to Syntax-Brillian's SPO.  Doc. 296 at 4; *see also* Doc. 275, Ex. D.

24  [6]     *See* Expert Report of Richard Puntillo for Individual Defendants ("Puntillo Report")

25  at 8, contained within the Declaration of Richard Puntillo in Support of Plaintiffs'
      Opposition to Defendants James Ching Hua Li and Man Kit (Thomas) Chow's

26  Memorandum of Points and Authorities in Support of Motion for Summary Judgment, Ex.
      A.  The term Offering Documents refers to the Company's Registration Statement dated

27  April 6, 2007, Prospectus dated April 30, 2007, Preliminary Prospectus Supplement dated
      May 14, 2007 and Prospectus Supplement dated May 23, 2007 and filed May 24, 2007.

28

1  with Kolin or of the use of proceeds from the SPO.  Puntillo Report at 15-21; Plaintiffs'

2  Separate Statement, Undisputed Item Nos. 1-2.  The content of the use of proceeds section in

3  the Offering Documents of a public offering is derived from a detailed forecast of cash flow

4  that has been prepared by the issuer and thoroughly vetted by the key executives and others,

5  particularly the CFO.  *Id.*  In order to accurately and completely describe the intended use of

6  proceeds, defendants should have performed a rigorous due diligence on past and expected

7  deposit activity with Kolin.  *Id.*  The case record demonstrates, however, that defendants

8  failed to conduct such due diligence.  *Id.*  On the contrary, for example, CEO Sollitto

9  testified that despite the representations that Syntax-Brillian made to investors, defendants

10  improperly sent money raised in the SPO to Kolin.  Ex. 19, at 197-215.  As a result, a

11  genuine issue of fact exists regarding defendants' liability under §11.  *Escott v. BarChris*

12  *Construction Corp.*, 283 F. Supp. 643, 682-85 (S.D.N.Y. 1968); *Feit v. Leasco Data*

13  *Processing Equip. Corp.*, 332 F. Supp. 544, 574-81 (E.D.N.Y. 1971).

14      **B.**    **A Genuine Issue of Fact Exists Regarding Whether Defendants'**
    **Misrepresentations in the SPO Caused Losses to Plaintiffs and**

15      **the Class**

16      Section 11(e) of the Securities Act provides a means to rebut the presumption of loss

17  causation once plaintiffs establish a *prima facie* case.  Section 11(e) – known as the negative

18  causation defense – provides:

19      [I]f the defendants proves that any portion or all of such damages represents
other than the depreciation in value of such security resulting from [the] part

20      of the registration statement [that contains the material misstatement or
omission], . . . such portion of or all such damages shall not be recoverable.

21

22  15 U.S.C. §77k(e).  Thus, under §11, defendants must disprove the presumed casual link

23  between the untrue fact and the "depreciation in value" of the security.  The burden on

24  defendants to prove the affirmative defense under §11(e) is "heavy" and "reflects Congress'

25  desire to allocate the risk of uncertainty to the defendants in these cases."  *Akerman v. Oryx*

26  *Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987); *Flowserve*, 572 F.3d at 234.  To meet

27  their heavy burden, defendants must "prove that the decline in value of [] stock resulted

28  'solely' from factors other than the material omissions" or misstatements.  *Collins v.*

*Signetics Corp.*, 605 F.2d 110, 115-16 (3d Cir. 1979); *see also Flowserve*, 572 F.3d at 234 (holding that defendants must prove that "the losses were caused by another factor").[7]

### 1. Courts Have Rejected Defendants' Loss Causation Theory that Corrective Disclosures Must Mirror the Misrepresentations Alleged Fact for Fact

Defendants contend that the only way that loss causation can be established is if Syntax-Brillian's September 12, 2007 and November 14, 2007 disclosures specifically revealed that the Company had engaged in improper accounting schemes.  Motion at 1.  Such an approach, however, makes it impossible to demonstrate loss causation without an admission or fact-for-fact disclosure of wrongdoing, and is at odds with the Supreme Court's decisions in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  Under *Dura*, **one way** to demonstrate loss causation is to show that the "relevant truth" about the "financial condition of a corporation" previously misrepresented or concealed became "generally known" and corrected the stock price.  544 U.S. at 342-44.  This proof can be established by demonstrating that the financial results revealed were "related" to the subject matter of the misrepresentations alleged.  As *Basic* emphasized, "There is [] ***more than one way*** to demonstrate the causal connection . . . between the plaintiffs' injury and the defendant's wrongful conduct."  485 U.S. at 243.

In *Daou*, the Ninth Circuit explicitly rejected the concept that there must be a public disclosure that defendants were "engaged in improper accounting ***practices***" in order to demonstrate loss causation.  411 F.3d at 1026.  Reversing a district court that had required

---

[7]     For a §10(b) claim, plaintiffs need only demonstrate that defendants' misrepresentations or omissions were a ***substantial*** factor in the stock's price decline.  *In re Daou Sys.*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("'As long as the misrepresentation is [a] substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement'"); *Miller v. Asensio & Co.*, 364 F.3d 223, 229, 232 (4th Cir. 2004) (loss causation requires "only that the plaintiff show that the defendant's conduct was a substantial cause of its injury") (emphasis in original).  In contrast, to meet their heavy negative-causation burden under §11, defendants must prove that the decline in Syntax-Brillian's stock price "resulted '***solely***' from factors other than the material omissions" or misstatements.  *Collins*, 605 F.2d at 115-16; *Flowserve*, 572 F.3d at 234.

such an explicit admission by defendants, the Ninth Circuit held that a plaintiff satisfies *Dura* by demonstrating that "the price of [defendant company's] stock fell precipitously after defendants began to reveal figures showing the company's ***true financial condition***." *Id.* Since *Daou*, the Ninth Circuit has repeatedly reaffirmed that loss to investors can be caused when the ***impact*** of defendants' wrongdoing on the company's true financial condition is revealed – even if the specific ***practices*** defendants used to accomplish their wrongdoing remain concealed. *Komie v. Saxton*, 277 Fed. Appx. 750, 751 (9th Cir. 2008) (***public revelation*** of "'true financial condition'" combined with ***complaint allegations*** linking that condition to fraud are necessary to plead loss causation); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989-90 (9th Cir. 2008); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008).

In *Berson*, as in *Daou*, the Ninth Circuit upheld a theory of loss causation alleging that defendants' wrongdoing was revealed to the market through disclosure of the company's true financial condition – not revelation of defendants' improper practices: "The ***complaint*** describes the stop-work orders in detail, explains that the orders halted a significant amount of work, alleges that the reduced workload caused revenue to fall by 25%, and claims that ***this revenue reduction*** caused the stock price to drop by 16%." 527 F.3d at 989. Thus, the only public disclosure causing loss was the ***impact*** of the fraud – the 25% revenue reduction. *Id.* at 984. Moreover, beyond not requiring a public ***disclosure*** of the practices, *Berson* acknowledged that plaintiffs had not even ***alleged*** "precisely which parts of which contracts three of the stop-work orders [were] affected." *Id.* at 989. Instead, the court recognized that loss was caused when defendants disclosed the ***impact*** of the (still concealed) stop-work orders on the company's revenues – its true financial condition. *Id.* at 989-90. *Gilead*, following *Daou*, *Komie*, and *Berson*, further confirms this distinction. Even where defendants' fraudulent practices ***were*** publicly revealed, the Ninth Circuit recognized that loss was not caused until the company disclosed the ***impact*** of the improper practices on its true financial condition. *Gilead*, 536 F.3d at 1053-54. Indeed, several circuits have recently rejected such "mirror-image" tests as both legally incorrect and unduly onerous. The Fifth

Circuit (with Justice O'Connor sitting) held that "[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements." *Flowserve*, 572 F.3d at 230.  The Tenth Circuit held that "[t]o be corrective, the disclosure need not precisely mirror the earlier misrepresentation."  *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).   Thus, defendants' loss causation theory does not comport with applicable authority on loss causation standards.[8]

### 2. The Losses Suffered by Plaintiffs and the Class Are Related to Defendants' Misrepresentations in the SPO

Courts have held that even if a defendant meets its burden under Rule 56, "the plaintiff may survive a summary judgment motion by coming forward with evidence suggesting that the price decline resulted from the alleged misstatement." *In re WRT Energy Sec. Litig.*, No. 96 Civ. 3610 (JFK), 2005 U.S. Dist. LEXIS 18701, at *6 (S.D.N.Y. Aug. 30, 2005).  Plaintiffs have done so here.  Plaintiffs have submitted evidence based upon expert opinion that "[t]he market discerned the previously concealed information and learned about the true operating and financial conditions of the Company via disclosures made on 12 September 2007 and 14 November 2007."[9]  Plaintiffs' expert explains that "[b]y causing analysts and investors to overestimate cash flow from sales and accounts receivables, the

---

[8]      The decision in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008) represents a deviation from the loss causation standards established by the weight of Ninth Circuit authority reflected by *Daou*, *Berson*, *Gilead* and *Komie*.  The district court decision cited by defendants – *In re Shoretel Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009 U.S. Dist. LEXIS 11151 (N.D. Cal. Feb. 2, 2009) – was followed by *In re Shoretel Inc. Sec. Litig.*, No. C 08-00271 CRB, 2009 U.S. Dist. LEXIS 73316 (N.D. Cal. Aug. 19, 2009).  In the latter decision, the court held that although "the press release says nothing" about the alleged misrepresentations, "[i]t is not impossible that the market understood the press release to have revealed previously undisclosed facts about misstatements in the Registration Statement."  *Id.* at *10-*12.

[9]      *See* Expert Report of Steven P. Feinstein, Ph.D., CFA ("Feinstein Report") at 42, contained within the Declaration of Steven P. Feinstein, Ph.D., CFA in Support of Plaintiffs' Opposition to Defendants James Ching Hua Li and Man Kit (Thomas) Chow's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Feinstein Decl."), Ex. A; Plaintiffs' Separate Statement, Undisputed Item No. 4.

alleged misrepresentations and omissions concealed from analysts and investors that the Company had a cash flow problem that threatened its growth and viability." Feinstein Report at 21. Plaintiffs' expert also opined that "[t]he price of Syntax-Brillian stock was artificially inflated by at least $2.43 per share during the Class Period on account of the alleged misrepresentations and omissions." *Id.* at 42; *see also Id.* at 4, 17-19, 30-35; Plaintiffs' Separate Statement, Undisputed Item No. 5. Additionally, "[i]n response to partially corrective disclosures through which the market learned of errors and alleged irregularities in the Company's accounting and gained a better understanding of the true condition of the Company's operating and financial conditions, the inflation dissipated and the stock price fell." Feinstein Report at 4. "Numerous investors are similarly situated in that they purchased Syntax-Brillian stock during the Class Period and suffered losses that were caused by the alleged misrepresentations and omissions." *Id.* at 42. As a result, "the court simply cannot conclude as a matter of law that the plaintiffs' losses 'resulted from factors other than the material misstatement in the registration statement.'" *In re Adams Golf, Inc*., 618 F. Supp. 2d 343, 347-48 (D. Del. 2009); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 560 (N.D. Ill. 2007).

## C.  A Genuine Issue of Fact Exists for Plaintiffs' Claims Under §12 of the Securities Act and §10(b) of the Exchange Act

Defendants also have not satisfied their burden to demonstrate that the Court should enter judgment as a matter of law with respect to plaintiffs' §12 claim under the Securities Act and §10(b) claim under the Exchange Act. "Section 12(a)(2) of the 1933 Securities Act imposes civil liability on any person for use of any instrumentality of interstate commerce to offer or sell securities by means of a prospectus or oral communication that includes 'an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.'" *Daou*, 411 F.3d at 1028-29; 15 U.S.C. §77l(a)(2). Like plaintiffs' §11 claim, causation "is not a necessary element of a prima facie case under section 12 of the Securities Act." *Daou*, 411 F.3d at 1029; *Casella v. Webb*, 883 F.2d 805, 808 & n.8 (9th Cir. 1989).

1    The Ninth Circuit has held that if the alleged misrepresentations are material, a plaintiff

2    bringing suit under §12 is entitled to recovery "regardless of whether the loss is due to the

3    fraud or to a general market decline." *Casella*, 883 F.3d at 808-9; *Daou*, 411 F.3d at 1029.

4         Here, plaintiffs have submitted evidence demonstrating that defendants made

5    misrepresentations and omissions and that such misrepresentations and omissions were

6    material.  Puntillo Report at 8, 15-21; Plaintiffs' Separate Statement, Undisputed Items Nos.

7    1-3.  Additionally, although not required for plaintiffs' §12 claims, plaintiffs have, in fact,

8    proffered evidence demonstrating that the losses suffered by plaintiffs and the class were

9    caused by defendants' misrepresentations and omissions.  Feinstein Report, 4, 15-42;

10   Plaintiffs' Separate Statement, Undisputed Item Nos. 4-5.  Defendants, moreover, have not

11   demonstrated that any other factor caused the declines in the Company's stock price.

12   Accordingly, it would constitute reversible error for the Court to grant summary judgment on

13   this basis.  *Casella*, 883 F.3d at 808-9.

14        For plaintiffs' §10(b) claims, plaintiffs must ultimately prove: (i) "***a material***

15   ***misrepresentation (or omission)***;" (ii) "***scienter***, *i.e.*, a wrongful state of mind;" (iii) ***a***

16   ***connection with the purchase or sale of a security***;" (iv) ***reliance***, often referred to in cases

17   involving public securities markets (fraud-on-the-market cases) as 'transaction causation'";

18   (v) "***economic loss***"; and (vi) "'***loss causation***,' *i.e.*, a causal connection between the

19   material misrepresentation and the loss." *Dura*, 544 U.S. at 341-42.  Through their Motion,

20   defendants move for summary judgment only with respect to the last element of loss

21   causation.  Motion at 1-2.  As demonstrated above, however, plaintiffs' evidence would

22   support a jury finding that defendants' misrepresentations and omissions caused the losses

23   suffered by plaintiffs and the class.  Feinstein Report, 4, 15-42; Statement of Undisputed

24   Facts, Items No. 4-5.[10]  Accordingly, the Court must deny defendants' Motion.

25

---

26   [10]    The evidence proffered by plaintiffs also demonstrates that genuine issues of material
27   fact exist regarding the other elements as well.  Specifically, the evidence would support a
     finding by a reasonable jury that: (1) defendants made material misrepresentations and
28   omissions (Puntillo Report at 8-15; Plaintiffs' Separate Statement, Undisputed Item Nos.

### D.     A Genuine Issue of Fact Exists for Plaintiffs' Control Person Claims Against Defendants

To prove control person liability, a plaintiff must prove: (i) a primary violation of federal securities law; and (ii) defendant's power or control over the primary violator. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000); 17 C.F.R. §230.405; *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 788 (C.D. Cal. 2004). A plaintiff "need not show a controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996). Once the plaintiff establishes that a defendant is a controlling person, the defendant then bears a burden of proving that he or she acted in good faith. *Id.* Given the positions held by COO Li and Chief Procurement Officer Chow and their inability to demonstrate good faith, their involvement "with the day-to-day operations and the financial aspects of [the Company] supports an inference sufficient to withstand a motion for summary judgment." *Homestore*, 347 F. Supp. 2d at 790; Sams Decl., Exs. 2-19.

## V.     CONCLUSION

For the foregoing reasons, the Court should deny defendants' Motion.

DATED: October 16, 2009                    Respectfully submitted,

                                          COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          EX KANO S. SAMS II


                                                    s/ Ex Kano S. Sams II
                                          EX KANO S. SAMS II

---

1-3); (2) defendants acted with scienter (Sams Decl., Exs. 2-17; Ex. 18 at 27-29, 32-36, 43-47, 60-71, 122-23, 161-79, 190-91, 202-04, 225-63; Ex. 19 at 57, 62-67, 70-71, 84, 95, 97, 111, 114, 116-19, 127, 135-39, 151, 166-67, 184-85, 197-215, 245-51; Statement of Undisputed Facts, Item No. 6); (3) the misrepresentations and omissions were made in connection with the purchase or sale of a security (Order, Doc. 296 at 4; Declaration of Jonathan E. Behar in Further Support of Plaintiffs' Amended Motion for Class Certification, Ex. D, Doc. 275); (4) reliance (Feinstein Report, at 4, 15-42; Plaintiffs' Separate Statement, Undisputed Item Nos. 4-5); and (5) economic loss (Feinstein Report, at 4, 15-42; Plaintiffs' Separate Statement, Undisputed Item Nos. 4-5).

9601 Wilshire Blvd., Suite 510
Los Angeles, CA 90210
Telephone: 310/859-3100
310/278-2148 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
G. PAUL HOWES
DEBRA J. WYMAN
DANIEL S. DROSMAN
SCOTT H. SAHAM
SAMANTHA A. SMITH
SHANNON M. MATERA
JENNIFER Y. LAI
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

BUCKLEY KING
MICHAEL SALCIDO
2020 North Central Avenue, Suite 1120
Phoenix, AZ 85004
Telephone: 602/424-2550
602/424-2566 (fax)

Liaison Counsel

VANOVERBEKE MICHAUD
   & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Plaintiffs

S:\CasesSD\Syntax-Brillian\BRF00062333_Li & Chow Oppo.doc

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on October 16, 2009, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system which will send notification of such filing to

4

the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify

5

that I have mailed the foregoing document or paper via the United States Postal Service to

6

the non-CM/ECF participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that

8

the foregoing is true and correct.  Executed on October 16, 2009.

9

10

 s/ EX KANO S. SAMS II
EX KANO S. SAMS II

11

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP

12

9601 Wilshire Blvd., Suite 510
Los Angeles, CA  90210

13

Telephone:  310/859-3100
310/278-2148 (fax)

14

15

E-mail:      exkanos@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 2:07-cv-02204-FJM

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Bruce A Abbott**
  Bruce.Abbott@mto.com,Valentina.Neufeld@mto.com

- **Joseph G Adams**
  jgadams@swlaw.com,mgarsha@swlaw.com,docket@swlaw.com

- **Shaunt T Arevian**
  sarevian@irell.com

- **Jonathan E Behar**
  jbehar@csgrr.com,jbehar@csgrr.com,aromero@csgrr.com

- **James J Belanger**
  jbelanger@csblaw.com,ejames@csblaw.com

- **Maureen Beyers**
  mbeyers@omlaw.com,lsmock@omlaw.com,ecfdc@omlaw.com

- **Avi Braz**
  avi.braz@mto.com

- **Gustavo Fabian Bruckner**
  bruckner@whafh.com

- **H Michael Clyde**
  MClyde@perkinscoie.com,docketphx@perkinscoie.com,lsandoval@perkinscoie.com

- **Sean K Collins**
  scollins@csgrr.com,scollins@csgrr.com,keagen@csgrr.com

- **Efren A Compean**
  ecompean@garrett-tully.com

- **Christopher Robert Cowan**
  ccowan@irell.com

- **Michelle Craven**
  mcraven@gibsondunn.com

- **Jonathan Cobb Dickey**
  jdickey@gibsondunn.com

- **Daniel S Drosman**

ddrosman@csgrr.com,tholindrake@csgrr.com

- **Douglas H Fitch**
  dfitch@jbhhlaw.com,mterry@jbhhlaw.com

- **Andrew S Friedman**
  afriedman@bffb.com,rcreech@bffb.com,ngerminaro@bffb.com

- **Francis M Gregorek**
  gregorek@whafh.com

- **Susan L Hoffman**
  susan.hoffman@bingham.com,gloria.moonesinghe@bingham.com

- **Joel Philip Hoxie**
  jhoxie@swlaw.com,jkfisher@swlaw.com,docket@swlaw.com

- **Mark P Hummels**
  mhummels@omlaw.com,bwendt@omlaw.com,ecfdc@omlaw.com

- **Jennifer Y Lai**
  jlai@csgrr.com

- **James Raza Lawrence**
  Raza.Lawrence@mto.com,Sharon.Nial@mto.com

- **Rebecca Justice Lazarus**
  rjustice@gibsondunn.com,rmcbain@gibsondunn.com

- **Daniel P Lefler**
  dlefler@irell.com

- **Frank Lewis**
  franklewis@aol.com

- **Jeffrey D Light**
  jeffl@csgrr.com,jstark@csgrr.com

- **John L Lin**
  jlin@garrett-tully.com

- **Jennifer Lopez**
  jennifer.lopez@bingham.com

- **Robert A Mandel**
  mandelr@gtlaw.com,coles@gtlaw.com

- **Shannon McKenna Matera**
  smatera@csgrr.com,Hkharadjian@csgrr.com,Rduenez@csgrr.com

- **Kevin Michael McGee**
  kmcgee@zsz.com

- **Gregory Mark Nespole**
  nespole@whafh.com

- **John David Pernick**
  john.pernick@bingham.com,frank.downing@bingham.com

- **Patricia Lee Refo**
  prefo@swlaw.com,jaltendorf@swlaw.com,docket@swlaw.com

- **Darren J Robbins**
  darrenr@csgrr.com,E_File_SD@csgrr.com

- **Hart Lawrence Robinovitch**
  hlr@zimmreed.com,sab@zimmreed.com,az.clerk@zimmreed.com

- **David B Rosenbaum**
  drosenbaum@omlaw.com,kdourlein@omlaw.com,ecfdc@omlaw.com

- **Michael Salcido**
  salcido@buckleyking.com,kennelly@buckleyking.com

- **Ex Kano S Sams , II**
  exkanos@csgrr.com,exkanos@csgrr.com

- **Brian Jay Schulman**
  schulmanb@gtlaw.com,fischerc@gtlaw.com

- **Robert F Serio**
  rserio@gibsondunn.com

- **Rebecca K Setlow**
  RSetlow@perkinscoie.com,docketphx@perkinscoie.com,rweidner@perkinscoie.com

- **Charlene S Shimada**
  charlene.shimada@bingham.com,frank.downing@bingham.com

- **Laura Elizabeth Sixkiller**
  sixkillerl@gtlaw.com,hinkell@gtlaw.com

- **Samantha A Smith**
  ssmith@csgrr.com

- **Richard A Speirs**
  rspeirs@zsz.com,dlanier@zsz.com

- **Lee Squitieri**
  lee@sfclasslaw.com

- **Stephen J Tully**
  stully@garrett-tully.com

- **Craig Varnen**
  cvarnen@irell.com

- **Frank Verderame**
  fverderame@plattner-verderame.com,edegrave@plattner-verderame.com

- **E Jeffrey Walsh**
  walshj@gtlaw.com,bergerp@gtlaw.com

- **Lillie A Werner**
  lwerner@irell.com

- **Debra J Wyman**
  debraw@csgrr.com

- **Joseph J Ybarra**
  joseph.ybarra@mto.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`